# ATTACHMENT A



LEXSEE 2007 U.S. DIST. LEXIS 66208



Positive
As of: Nov 27, 2009

### In re CRUDE OIL COMMODITY LITIGATION

### Master File 06 Civ. 6677 (NRB)

### UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK

### 2007 U.S. Dist. LEXIS 66208

### September 7, 2007, Decided
### September 7, 2007, Filed

**PRIOR HISTORY:** In re Crude Oil Commodity Litig., 2007 U.S. Dist. LEXIS 47902 (S.D.N.Y., June 28, 2007)

**COUNSEL:**   **[*1]** For Plaintiffs: Geoffrey M. Horn, Esq., Vincent Briganti, Esq., Lowey Dannenberg Bemporad Sellinger & Cohen, P.C., White Plains, NY.

For Defendant: Leslie Smith, Esq., Bredale Rucker, Esq., Kirkland & Ellis, Chicago, IL; Peter D. Doyle, Esq., Kirkland & Ellis LLP, New York, NY.

**JUDGES:** NAOMI REICE BUCHWALD, UNITED STATES DISTRICT JUDGE.

**OPINION BY:** NAOMI REICE BUCHWALD

**OPINION**

####    MEMORANDUM AND ORDER

**NAOMI   REICE   BUCHWALD,   UNITED STATES DISTRICT JUDGE**

Plaintiffs Richard Hershey, Michael Anastasio, Peter C. Fede, Fred Dray, Max Wulff, and Roberto Calle Gracey (collectively, "plaintiffs") brought this case on behalf of themselves and all others who purchased and/or sold light, sweet crude oil futures and options contracts on the New York Mercantile Exchange ("NYMEX"), alleging that BP America, Inc., BP Products North America, Inc., BP Corporation North America, Inc., and defendants John Does 1-10 (collectively "defendants") acted to unlawfully manipulate the prices of light, sweet crude oil futures and options contracts traded on the NYMEX during the putative class period, starting on January 1, 2001 and continuing until a date unknown by the plaintiffs but believed to extend at least until December 31, 2004, in contravention   **[*2]** of the Commodity Exchange Act ("CEA"), as amended, 7 U.S.C. § 1 *et seq.* Defendants moved to dismiss the complaint pursuant to Rule 12(b)(6) on the ground that the complaint failed to meet the pleading requirements of Rules 8(a) and 9(b) of the Federal Rules of Civil Procedure. On June 28, 2007, we issued a Memorandum and Order (" Opinion ") granting defendants' motion and dismissing the case

2007 U.S. Dist. LEXIS 66208, *

in its entirety. *In re Crude Oil Commodity Litigation*, No. 06 Civ. 6677 (NRB), 2007 U.S. Dist. LEXIS 47902, 2007 WL 1946553 (S.D.N.Y. June 28, 2007). Plaintiffs have now moved for: (1) reconsideration of our Opinion dismissing the case pursuant to Local Civil Rule 6.3; (2) the alteration or amendment of the Order and Judgment dated June 29, 2007 to provide that the dismissal be without prejudice, pursuant to Fed. R. Civ. P. 59(e); and (3) leave to file an amended complaint within 60 days from the date of the Order and Judgment, pursuant to Fed. R. Civ. P. 15(a). For the reasons set forth below, plaintiffs' motions are denied.

### BACKGROUND

We believe that a brief review of the procedural history of this case is necessary to contextualize plaintiffs' motions and to demonstrate the numerous previous opportunities plaintiffs were   **[*3]** accorded to remedy the conclusory nature of their complaint and/or to request permission to do so.

First, at the outset, it should be noted the complaint which was the subject of the Opinion was a Consolidated Amended Complaint (sometimes referred to as the "Complaint") filed after this Court signed an order on October 16, 2006, consolidating five separately filed cases [1] and granting the plaintiffs 60 days to file a consolidated complaint. On December 26, 2006, plaintiffs, represented by three well-recognized and experienced class action law firms as interim class counsel, filed the 27 page Consolidated Amended Complaint, which was not only twice the length of the previously submitted complaints, but was also substantively different than the original complaints in that it contained additional theories of how defendants purportedly worked to manipulate the market of crude oil in violation of the CEA.

> 1   We note that one of the complaints in the individual cases had been amended prior to consolidation.

The second opportunity plaintiffs had to amend was afforded to them on February 14, 2007, when pursuant to this Court's individual practices, defendants wrote to this Court stating their   **[*4]** intention to file a motion to dismiss pursuant to Rule 12(b)(6). The three page letter explained that the basis for the proposed motion was that Rule 9(b)

should apply to plaintiffs' CEA claim, since the actions allegedly taken in furtherance of defendants' market manipulation scheme sounded in fraud, and that the conclusory nature of the Consolidated Amended Complaint not only failed to satisfy the heightened pleading standard of Rule 9(b), but also the notice pleading standard of Rule 8(a). Thus, receipt of this letter by plaintiffs put them on notice of the grounds for defendants' intended motion to dismiss. Plaintiffs chose to respond to this letter by asserting that defendants' proposed motion was without merit and without requesting leave to amend their Consolidated Amended Complaint.

Defendants served their motion on February 16, 2007, the substance of which mirrored the letter they had previously submitted. Plaintiffs could have responded to the motion by filing an amended complaint, but chose not to do so. Instead, in footnote 27 of their opposition brief, plaintiffs simply noted that "[i]n the event that this Court concludes the Complaint's allegations are inadequate, Plaintiffs **[*5]** request leave to amend." *See* Plaintiff's Memorandum of Law in Opposition ("Pl. Mem. Opp.") at 24 n.27.

Given plaintiffs' decision to rest on the Consolidated Amended Complaint, we considered the motion to dismiss and on June 28, 2007, we issued our 23 page Opinion . We concluded that plaintiffs' Consolidated Amended Complaint was "replete with innuendo and devoid of detail," *In re Crude Oil Commodity Litigation*, 2007 U.S. Dist. LEXIS 47902, 2007 WL 1946553 at *7, and that in light of *In re Natural Gas Commodity Litigation*, 358 F. Supp. 2d 336, 343 (S.D.N.Y. 2005), which applied Rule 9(b) to claims of market manipulation under the CEA, the Consolidated Amended Complaint should be dismissed for failure to fulfill the pleading requirements of Rule 9(b). [2]

> 2   We note that *In re Natural Gas Commodity Litigation*, cited by both plaintiffs and defendants in their papers, is the authority from this Circuit which considered the issue of whether Rule 9(b) should apply to claims of market manipulation under the CEA.

As noted earlier, on July 16, 2007, plaintiffs moved for: (1) reconsideration of the Opinion dismissing the action with prejudice pursuant to Local Civil Rule 6.3; (2) alteration or amendment of the

Order and Judgment **[*6]** dated June 29, 2007 to provide that the dismissal be without prejudice, pursuant to Rule 59(e); and (3) for leave to file an amended complaint pursuant to Rule 15(a). [3] Curiously, neither the moving memorandum nor the reply memorandum mention any substantive basis on the merits for reconsideration of our decision to dismiss the complaint, nor any substantive law overlooked by this Court in coming to its decision. Instead, in a footnote, plaintiffs state that "[i]n moving for reconsideration of the Order on the grounds that the action should not have been dismissed with prejudice and that Plaintiffs should have been granted leave to amend the Complaint . . . Plaintiffs do not waive, and hereby preserve, arguments which Plaintiffs believe are more appropriate for resolution after the Court renders its decision on the relief requested herein." Plaintiff's Memorandum of Law in Support of Plaintiffs' Motion for Reconsideration at 2 n.1. Plaintiffs then recite three arguments they appear to wish to preserve, all of which were considered in our previous Opinion.

> 3   The tripartite motion recognizes existing Second Circuit precedent which requires that following the entry of judgment dismissing **[*7]** a complaint, relief therefrom must be sought under Rule 59 before leave to amend may be granted (*National Petrochemical Co. v. M/T Stolt*, 930 F.2d 240, 244 (2d Cir. 1991)) and that the right to amend provided for in Rule 15(a) terminates after a motion to dismiss is granted. *Elfenbein v. Gulf & Western Indus. Inc.*, 590 F.2d 445, 448 n.1 (2d Cir. 1978).

In their papers, plaintiffs cite to various lines of authority which are not wholly reconcilable. However, this is not the occasion to engage in that reconciliation effort as the procedural history of this case is readily distinguishable from the cases cited to us. Instead, we shall turn to the specifics of the motion before us.

## 1. Motion for Reconsideration and/or Alteration or Amendment of Order

A motion for reconsideration pursuant to Local Rule 6.3 is "an extraordinary remedy to be employed sparingly in the interests of finality and conservation of scarce judicial resources," *In re Initial Public Offering Sec. Litig.*, 399 F. Supp. 2d 298, 300 (S.D.N.Y. 2005) (internal citation and quotation marks omitted), *aff'd sub nom Tenney v. Credit Suisse First Boston Corp., Inc.*, 2006 U.S. App. LEXIS 13050, 2006 WL 1423785 (2d Cir. May 19, 2006), and appropriate only when **[*8]** a court overlooks "controlling decisions or factual matters that were put before it on the underlying motion" and which, if examined, might reasonably have led to a different result. *Eisemann v. Greene*, 204 F.3d 393, 395 n.2 (2d Cir. 2000). Moreover, a motion for reconsideration should not be treated as a "second bite of at the apple" for a party dissatisfied with a court's ruling. *Sequa Corp. v. GBJ Corp.*, 156 F.3d 136, 144 (2d Cir. 1998). Similarly, it is not appropriate to use a motion for reconsideration as a vehicle to advance new theories a party failed to articulate in arguing the underlying motion. *See Griffin Ins., Inc. v. Petrojam, Ltd.*, 72 F. Supp. 2d 365, 368 (S.D.N.Y. 1999). We read the total absence of any substantive argument in plaintiffs' submissions addressed to the merits of our dismissal of the Consolidated Amended Complaint as indicating that plaintiffs seek reconsideration of our decision only with regard to the dismissal with prejudice. Whether this is an acknowledgement of the weakness of plaintiffs' arguments on their merits or an effort to preserve any substantive arguments for appeal is not an issue we need to resolve.

We deny plaintiffs' request for reconsideration **[*9]** of our decision to dismiss with prejudice because plaintiffs have failed to provide us with a cogent reason to do so. It should be clear at the outset that the decision to dismiss with prejudice was a deliberate one, made with an awareness of the multiple opportunities presented to and spurned by plaintiffs to amend their complaint in lieu of opposing the substance of the motion. Moreover, plaintiffs failed in their original briefing to properly present the issue now raised. Plaintiffs' purported request for leave to amend was contained within a footnote in their opposition brief. Arguments which appear in footnotes are generally deemed to have been waived. *Cf. City of Syracuse v. Onondaga County*, 464 F.3d 297, 308 (2d Cir. 2006) (quoting *Norton v. Sam's Club*, 145 F.3d 114, 117 (2d Cir. 1998)). Accordingly, "[i]t is within the court's discretion to deny leave to amend implicitly by not addressing the request when leave is requested informally in a brief filed in opposition to a motion to

2007 U.S. Dist. LEXIS 66208, *

dismiss." *In re Tamoxifen Citrate Antitrust Litigation*, 429 F.3d 370, 404 (2d Cir. 2005), *opinion amended and superceded by* 466 F.3d 187 (2d Cir. 2006) (finding no abuse of discretion in district court's **[*10]** effective denial of plaintiffs' request to amend "which appeared in a footnote in the middle of the brief opposing the defendants' motion to dismiss"). Thus, in light of the failure of plaintiffs to request leave to amend in a procedurally sound manner, our dismissal with prejudice did not overlook any controlling authority. *Shields v. Citytrust Bancorp*, 25 F.3d 1124, 1132 (2d Cir. 1994) ("Although federal courts are inclined to grant leave to amend following a dismissal order, we do not deem it an abuse of the district court's discretion to order a case closed when leave to amend has not been sought.").

## 2. Leave to Amend

To the extent that plaintiffs' application for leave to file an amended complaint is considered timely, it is denied on the merits. Although we are well aware of the fact that generally, leave to amend "shall be freely given when justice so requires," Fed. R. Civ. P. 15(a), and that "[c]omplaints dismissed under Rule 9(b) are almost always dismissed with leave to amend," *Luce v. Edelstein*, 802 F.2d 49, 56 (2d Cir. 1986), we note that Rule 15(a) is not without limits. Specifically in this context the Second Circuit has observed: "Unless there is a valid basis to vacate **[*11]** the previously entered judgment, it would be contradictory to entertain a motion to amend the complaint." *National Petrochemical Co. v. M/T Stolt*, 930 F.2d 240, 245 (2d Cir. 1991). More generally, denial of leave to amend is appropriate where there is a reason to do so, such as bad faith or dilatory motive, undue prejudice to the opposing party by virtue of allowance of the amendment, or futility of the amendment. *Dluhos v. Floating and Abandoned Vessel, Known as New York*, 162 F.3d 63, 69 (2d Cir. 1998) (quoting *Foman v. Davis*, 371 U.S. 178, 182, 83 S. Ct. 227, 9 L. Ed. 2d 222 (1962)).

Plaintiffs' request for leave to amend is flawed. Plaintiffs have failed to provide this Court or defendants with a copy of the proposed amended complaint, nor even with any indication as to what information or allegations they would add to their complaint were leave to amend granted. Indeed,

plaintiffs even argue that they are not obligated to do so. *See* Plaintiffs' Reply Memorandum of Law at 5. However, Rule 7(b) requires that all motions "state with particularity the grounds therefore, and shall set forth the relief or order sought." Fed. R. Civ. P. 7(b)(1). In the context of a motion to amend, Rule 7(b) accordingly requires the **[*12]** movant to supply a copy of the proposed amendment. *See Bankruptcy Trust of Gerard Sillam v. REFCO Group, LLC*, No. 05 Civ. 10072 (GEL), 2006 U.S. Dist. LEXIS 54245, 2006 WL 2129786, at *5 (S.D.N.Y. July 28, 2006); *Smith v. Planas*, 151 F.R.D. 547, 550 (S.D.N.Y. 1993) ("In order to satisfy a prerequisite of particularity in a motion to amend, a complete copy of the proposed amended complaint must accompany the motion so that both the Court and the opposing parties can understand the exact changes sought."). Absent the opportunity to review plaintiffs' proposed amended complaint, or any more informal suggestion of allegations plaintiffs wish to amend, "this Court is forced to rule on a hypothetical amended complaint neither the Court nor defendants have seen," *REFCO Group*, 2006 U.S. Dist. LEXIS 54245, 2006 WL 2129786 at *5 (internal citation and quotation marks omitted), something we are loathe to do. Where plaintiffs fail to disclose what additional allegations they would make which might result in a viable complaint to be, we may assume amendment would be futile and need not grant leave to amend. *See, e.g., Horoshko v. Citibank, N.A.*, 373 F.3d 248, 249 (2d Cir. 2004) ("Because an amendment is not warranted '[a]bsent some indication as to what **[*13]** appellants might add to their complaint in order to make it viable,' the District Court was under no obligation to provide the Horoshkos with leave to amend their complaint . . . .") (quoting *National Union of Hospital and Health Care Emp., RWDSU, AFL-CIO v. Carey*, 557 F.2d 278, 282 (2d Cir. 1977)); *In re WorldCom, Inc. Securities Litigation*, 303 F. Supp. 2d 385, 391 (S.D.N.Y. 2004) ("The plaintiffs have not included any proposed amended pleading or indicated what they might allege to cure the deficiency identified in the motion to dismiss. The plaintiffs have already been permitted to file one amended pleading through the filing of this Consolidated Amended Class Action Complaint. In the absence of any identification of how a further amendment would improve upon the Complaint, leave to amend must be denied as futile.");

*Shields*, 25 F.3d at 1132 (affirming denial of leave to amend in a situation where "[i]t is not clear that the failure of pleading could be remedied by further amendment, nor has [plaintiff] suggested how that could be done").

The application of this approach is particularly apt here given the procedural history of this case, which provided plaintiffs with numerous opportunities **[*14]** to amend as well as full notice of the deficiencies in their Consolidated Amended Complaint. "When the moving party has had an opportunity to assert the amendment earlier, but has waited until after judgment before requesting leave, a court may exercise its discretion more exactingly." *State Trading Corp. of India v. Assurance-foreningen Skuld,* 921 F.2d, 409, 418 (2d Cir. 1990). Allowing plaintiffs leave to amend now would be condoning a strategy whereby plaintiffs "hedge their bets by holding such evidence back in the hopes of having another bite at the proverbial apple." *In re Nokia Oyj (Nokia Corp.) Securities Litigation,* 423 F. Supp. 2d 364, 409 (S.D.N.Y. 2006) (denying leave to amend a consolidated amended complaint where "plaintiffs' first allusion to potentially amending . . . prior to the dismissal of the action was through footnotes in their opposition brief") (internal citation omitted). Finding acceptable a mere footnote reference requesting leave, or a motion for leave to amend with neither a proposed pleading nor even a hint of the facts plaintiffs could plead to cure the deficiencies of the complaint, is to place district courts in the position of writing advisory opinions **[*15]** -- a result we endeavor to avoid by having defendants explain their proposed motion in advance and affording a plaintiff the choice of standing on his pleading or curing the noted deficiencies. [4] *See Bellikoff v. Eaton Vance Corp..*, *481* F.3d *110*, No. 05-6957-CV (2d Cir. Mar. 15, 2007) ("plaintiffs 'were not entitled to an advisory opinion from the Court informing them of the deficiencies in the complaint and then an opportunity to cure those deficiencies'") (quoting *In re Eaton Vance Mut. Funds Litig.*, 403 F. Supp. 2d

310, 318 (S.D.N.Y. 2005) (citation omitted)). Accordingly, we find without merit plaintiffs' attempt to now rectify the deficiencies of their dismissed Consolidated Amended Complaint, when they had many months before its dismissal to adequately do so. [5]

> 4    An instructive analogy may be found in the Second Circuit's recent decision in *Kassner v. 2nd Ave. Delicatessen, Inc.*, 496 F.3d 229, 2007 U.S. App. LEXIS 17523, 2007 WL 2119769 (2d Cir.2007) where the Court held "that amendment of a pleading as a matter of course pursuant to Rule 15(a) is subject to the district court's discretion to limit the time for amendment of the pleadings in a scheduling order issued under Rule 16(b)", which **[*16]** permits modification only "upon showing of good cause."
>
> 5    As noted, plaintiffs also moved pursuant to Fed. R. Civ. P. 59(e) to alter or amend the judgment to provide that the dismissal be without prejudice. We recognize as mentioned in footnote *3* that resort to Rule 59(e) is required since a judgment was entered. However, while 59(e) provides the procedural mechanism the other aspects of plaintiffs' motion raise the substantive issues. The denial of this aspect of plaintiffs' motion follows from our denials of their motions for reconsideration or leave to amend.

### CONCLUSION

For the reasons set forth above, we deny plaintiffs' motions.

**IT IS SO ORDERED.**

Dated: New York, New York

August 24, 2007

NAOMI REICE BUCHWALD

UNITED STATES DISTRICT JUDGE





Analysis
As of: Nov 26, 2009

### COLUMBUS DRYWALL & INSULATION, INC., et al., on behalf of a class of similarly situated persons, Plaintiff, v. MASCO CORPORATION, et al., Defendants.

### CIVIL ACTION NO. 1:04-CV-3066-JEC

### UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF GEORGIA, ATLANTA DIVISION

### 2009 U.S. Dist. LEXIS 30937; 2009-1 Trade Cas. (CCH) P76,554

### February 9, 2009, Decided
### February 9, 2009, Filed

**PRIOR HISTORY:** Columbus Drywall & Insulation, Inc. v. Masco Corp., 2007 U.S. Dist. LEXIS 52589 (N.D. Ga., July 20, 2007)

**COUNSEL: [*1]** For Columbus Drywall & Insulation, Inc., Leo Jones Insulation, Inc., Southland Insulators, Inc., Southland Insulators of Maryland, Inc., doing business as Devere Insulation, Southland Insulators of Delaware LLC, doing business as Delmarva Insulation, Whitson Insulation of Grand Rapids, Inc., on behalf of a class of similarly situated persons, Plaintiffs: Craig Gordon Harley, James M. Wilson, Jr., LEAD ATTORNEYS, Chitwood Harley Harnes, Atlanta, GA; Frank M. Lowrey, IV, LEAD ATTORNEY, Bondurant Mixson & Elmore, Atlanta, GA; Jeffrey L. Berhold, LEAD ATTORNEY, Jeffrey L. Berhold, P.C., Atlanta, GA; Michael B. Terry, Ronan P. Doherty, LEAD ATTORNEYS, Steven Rosenwasser, Bondurant Mixson & Elmore, Atlanta, GA.

For Masco Corporation, Masco Contractor Services Central, Inc., Defendants: Allyson M. Maltas, LEAD ATTORNEY, PRO HAC VICE, Latham & Watkins-DC, Washington, DC; Andrew D. Morton, Eric J. McCarthy, Gregory S. Seador, William R. Sherman, LEAD ATTORNEYS, Margaret M. Zwisler, Latham & Watkins-DC, Washington, DC; David A. Ettinger, LEAD ATTORNEY, Honigman Miller Schwartz & Cohn-MI, Detroit, MI; Gregory D. Wittrock, LEAD ATTORNEY, Office of Gregory D. Wittrock, Taylor, MI; Kenneth G. Cole, **[*2]** LEAD ATTORNEY, Masco Corporation, Taylor, MI; Samuel Wade Malone, Nelson Mullins Riley & Scarborough-ATL, Atlanta, GA.

For Masco Contractor Services Group Corp., Masco Contractor Services East, Inc., Defendants: Allyson M. Maltas, LEAD ATTORNEY, PRO HAC VICE, Latham & Watkins-DC, Washington, DC; Andrew D. Morton, Eric J. McCarthy, Gregory S. Seador, William R. Sherman, LEAD ATTORNEYS, Margaret M. Zwisler Latham & Watkins-DC, Washington, DC; David A. Ettinger, LEAD ATTORNEY,

2009 U.S. Dist. LEXIS 30937, *; 2009-1 Trade Cas. (CCH) P76,554

Honigman Miller Schwartz & Cohn-MI, Detroit, MI; Samuel Wade Malone, Nelson Mullins Riley & Scarborough-ATL, Atlanta, GA.

For Johns Manville (Inc.), Defendant: Kimberly Lillian Myers, Tony Glen Powers, LEAD ATTORNEYS, John J. Almond, Phillip S. McKinney, Rogers & Hardin, Atlanta, GA.

For Certainteed Corporation, Defendant: June Ann Sauntry, James Andrew Lamberth, LEAD ATTORNEY, Troutman Sanders, Atlanta, GA.

For Knauf Insulation GMBH, Defendant: Daniel R. Gravelyn, LEAD ATTORNEY, Barnes & Thornburg, LLP-MI, Grand Rapids, MI; Daniel Patrick Griffin, LEAD ATTORNEY, Miller & Martin-Atl, Atlanta, GA; Deborah Pollack-Milgate, Donald E. Knebel, Hongsun Yoon, Kendall Millard, Lynn C. Tyler, LEAD ATTORNEYS, Barnes & Thornburg-IN, [*3] Indianapolis, IN.

For Guardian Fiberglass, Inc., Defendant: Aradhana Das, LEAD ATTORNEY, Guardian Industries Corp., Auburn Hills, MI; Corey C. Watson, Russell A. Archer, LEAD ATTORNEYS, Kirkland & Ellis LLP-CA, Los Angeles, CA; Thomas M. Pastore, LEAD ATTORNEY, Guardian Industries Corp., Auburn Hills, MI; Cornelius David Vaughan, Charles Conrow Murphy, Jr., Ellen G. Schlossberg, Vaughan & Murphy, Atlanta, GA.

For Guardian Building Products Distribution, Inc., Defendant: Corey C. Watson, Russell A. Archer, LEAD ATTORNEYS, Kirkland & Ellis LLP-CA, Los Angeles, CA; Charles Conrow Murphy, Jr., Ellen G. Schlossberg, Vaughan & Murphy, Atlanta, GA.

For Wilson Insulation of Augusta, Inc., Movant: Jeffrey L. Berhold, LEAD ATTORNEY, Jeffrey L. Berhold, P.C., Atlanta, GA.

Laurence P. Czajkowski, Movant, Pro se, West Haven, CT.

Superior Roofing and Siding of Trumbull, Ct LLC, Movant, Pro se, New Haven, CT.

**JUDGES:** JULIE E. CARNES, CHIEF UNITED STATES DISTRICT JUDGE.

**OPINION BY:** JULIE E. CARNES

**OPINION**

**ORDER and OPINION**

This case is presently before the Court on defendant's Motion to Exclude the **Expert** Testimony of Jeffrey Leitzinger [434], defendant's Motion for Summary Judgment [435], plaintiffs' **Renewed Motion for Class Certification** [*4] [474], defendant's Motion for Sanctions [523], and plaintiffs' Motion for Leave to File a Supplemental Brief in Opposition to the Motion for Sanctions [560]. The Court has reviewed the record and the arguments of the parties and, for the reasons set out below, concludes that defendant's Motion to Exclude the **Expert** Testimony of Jeffrey Leitzinger [434] should be **DENIED**, defendant's Motion for Summary Judgment [435] should be **GRANTED in part** and **DENIED in part**, plaintiffs' **Renewed Motion for Class Certification** [474] should be **GRANTED**, defendant's Motion for Sanctions [523] should be **DENIED**, and plaintiffs' Motion for Leave to File a Supplemental Brief in Opposition to the Motion for Sanctions [560] should be **DENIED as moot**.

**BACKGROUND**

This is an antitrust case. Defendants Certainteed ("CT"), Johns Manville ("JM"), Guardian, and Knauf are fiberglass insulation manufacturers. (Def.'s Statement of Material Facts ("DSMF") [435-3] at P 35 and Pls.' Resp. to DSMF ("Pl.'s Resp. to DSMF") [448] at P 35.) Defendant Masco is a fiberglass insulation contractor. (DSMF [435-3] and Pls.' Resp. to DSMF [448] at PP 8-10.) Plaintiffs are 377 independent fiberglass insulation contractors who compete with [*5] Masco in the industry. (Second Am. Compl. ("SAC") [274] at PP 1, 35 and Expert Report of Dr. Jeffrey Leitzinger, attached to Def.'s Mot. to Exclude ("Leitzinger Report") [434-2] at P 5.) Plaintiffs contend that Masco violated the antitrust laws by conspiring with, and orchestrating a conspiracy between, the manufacturers to fix prices in the fiberglass insulation industry from January 1, 1999 through 2003. [1] (SAC at PP 2-3, 30 and Leitzinger Report [434-2] at P 5.)

2009 U.S. Dist. LEXIS 30937, *; 2009-1 Trade Cas. (CCH) P76,554

1   All of the manufacturer defendants have settled. (Scheduling Order [483] and Order [482].) Thus, Masco is the only remaining defendant in the case. (*Id*.)

The American fiberglass insulation market is an oligopolistic market The four manufacturers involved in this case, in addition to Owens-Corning ("OC"), produce almost all of the fiberglass insulation that is purchased in the United States. (DSMF [435-3] and Pls.' Resp. to DSMF [448] at PP 55, 57, 59, 63, 65.) All of the manufacturers' products are essentially the same. (*Id*. at PP 1-6; Leitzinger Report [434-2] at PP 70-73.) *See Reserve Supply Corp. v. Owens-Corning Fiberglas Corp*., 971 F.2d 37, 39 (7th Cir. 1992) ("Fiberglass insulation is an essentially homogeneous product [*6] which is marketed in standard sizes, grades ('R-values'), and formats."). Demand for the products, which is tied to housing starts, is generally inelastic. *Id*. at 49-50 (describing the nature of the American fiberglass market). Customers buy according to their needs, such that a lower price does not typically increase demand. *Id*. The insulation manufacturers sell their products directly to contractors, retailers, and distributors. (DSMF [435-3] and Pls.' Resp. to DSMF [448] at P 4.)

Masco is one of the nation's largest insulation contractors. 2 (*Id*. at PP 8-10.) As a result, Masco purchases a significant percentage of each manufacturer's product each year. (*Id*. at PP 35-37.) Because of its size, and the size, of its purchases, Masco has been able to negotiate price advantages over most other contractors in the industry. (*Id*. at P 38.) Plaintiffs contend, however, that between the beginning of 1999 and the end of 2003, Masco went beyond simply negotiating the lowest price it could obtain for insulation. (SAC [274] at P 2 and Pls.' Br. in Opp'n to Masco's Mot. for Summ. J. ("Pls.' Opp'n to Summ. J.") [446] at 1.) Plaintiffs specifically allege that, during that time frame, plaintiffs [*7] allege that Masco enlisted the manufacturers in a conspiracy to maintain and increase Masco's price advantage to the detriment of competing independent contractors. (SAC [274] at P 2.) According to plaintiffs, the manufacturers agreed to this arrangement in exchange for Masco's support for across-the-board price increases on insulation products during a time decreased demand and excess supply. (*Id*.)

Plaintiffs contend that the resulting agreements between Masco and the manufacturers violated the antitrust laws. (*Id*. at PP 2-3.)

2   By 2003, Masco installed at least 40-50% of all fiberglass insulation in new home constructions in the United States. (DSMF [435-3] and Pls.' Resp. to DSMF [448] at P 17.)

Masco has filed a motion for summary judgment on plaintiffs' antitrust claims, as well as a motion to exclude the testimony of plaintiffs' **expert** witness, Dr. Jeffrey Leitzinger, and a motion for sanctions. (Def.'s Mot. for Summ. J. ("Def.'s Mot. for Summ. J.") [435], Motion to Exclude the **Expert** Testimony of Jeffrey Leitzinger ("Mot. to Exclude") [434], and Mot. for Sanctions [523].) Plaintiffs have filed a **renewed motion for class certification**. (Pls.' Renewed Mot. for Class Certification [*8] ("Pls.' Mot. for Cert.") [474].) All of those motions are presently before the Court.

## DISCUSSION

### I. Masco's Motion to Exclude Dr. Leitzinger's Testimony

Plaintiffs have submitted the expert opinions of Dr. Jeffrey Leitzinger in support of their motion for class certification, and as evidence of liability. (*See* Leitzinger Report [434-2].) The admissibility of Dr. Leitzinger's testimony is governed by Rule 702 of the Federal Rules of Evidence. *Daubert v. Merrell Dow Pharms.*., 509 U.S. 579, 588, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993). Rule 702 provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise. . . .

FED. R. EVID. 702. Pursuant to Rule 702, expert testimony is admissible when: (1) the expert is qualified to testify competently; (2) the expert's methodology is reliable; and (3) the expert's testimony will assist the trier of fact to understand the evi-

Case 1:06-cv-00765-TJM-DRH   Document 320-1   Filed 11/29/09   Page 10 of 30

Page 4

2009 U.S. Dist. LEXIS 30937, *; 2009-1 Trade Cas. (CCH) P76,554

dence or to determine a fact at issue in the case. *Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1309 (11th Cir. 1999).

The **[*9]** *Daubert* Court emphasized the district court's "gatekeeping" role to ensure that scientific testimony is relevant and reliable before it is admitted as evidence. *Daubert*, 509 U.S. at 589-90. *See also Hudgens v. Bell Helicopters/Textron*, 328 F.3d 1329, 1342 (11th Cir. 2003) (noting "the repeated emphasis the Supreme Court has placed upon the district court's 'gatekeeping' role in the determination of whether expert evidence should be admitted"). This gatekeeping obligation applies "not only to testimony based on 'scientific' knowledge, but also to testimony based on 'technical' and 'other specialized' knowledge." *Kumho Tire Co., Ltd. Carmichael*, 526 U.S. 137, 141, 119 S. Ct. 1167, 143 L. Ed. 2d 238 (1999). The overarching goal of *Daubert's* gatekeeping requirement is to ensure that an expert "employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Id.* at 152.

### A. Dr. Leitzinger's Qualifications

In his expert report, Dr. Leitzinger presents a statistical analysis of market data that tends to support plaintiffs' conspiracy allegations. (Leitzinger Report [434-2] at P 7.) Masco concedes that Dr. Leitzinger is a professional economist with both a master's **[*10]** degree and a doctorate in economics from the University of California at Los Angeles. (*Id*. at P 1 and Def.'s Mem. in Supp. of Mot. to Exclude ("Def.'s Mem. to Exclude") [434-8] at 1.) In addition, it is undisputed that Dr. Leitzinger has twenty-five years of experience in analyzing markets and assessing allegations of anticompetitive conduct. (*Id*. at 1 2.)

Despite his credentials, Masco challenges Dr. Leitzinger's competence to render an "econometric" opinion in this case. (Def.'s Mem. to Exclude [434-8] at 20-21.) In support of its challenge, Masco does not cite any lack of experience or education on the part of Dr. Leitzinger. (*Id*.) Instead, Masco simply notes that Dr. Leitzinger had difficulty reciting the precise test for "simultaneity"--a statistical test that he ran in his rebuttal report--upon demand during his deposition. (*Id*. at 21.)

Although Dr. Leitzinger could not recite the specific equation used to test for simultaneity without consulting his work papers, he did ultimately offer a detailed explanation of the test. (Leitzinger Dep. II [531] at 7-10.) Moreover, Dr. Leitzinger testified that he subscribes to econometrics journals and that he has testified in this area before. **[*11]** (*Id*. at 62-63.) He stated further that he has published articles regarding, among other things, the application of econometrics to economic issues. (*Id*.) In the absence of a more specific challenge on the part of Masco, the Court finds that Dr. Leitzinger is qualified to testify as an economic expert, and to render an econometric opinion, in this case.

### B. Reliable Methodology

The Court also finds that Dr. Leitzinger's methodology is sufficiently reliable to meet the standard of Rule 702. As directed by plaintiffs' counsel, Dr. Leitzinger conducted his analysis under the hypothesis that the conspiracy operated from January 1, 1999 through December 31, 2003. (Leitzinger Report [434-2] at PP 5-6.) Defining 1999 through 2003 as the conspiracy period, and using 1998 and 2004 as base years, Dr. Leitzinger conducted a "before and after analysis" of the operational years of the alleged conspiracy. (*Id*. at PP 103-13.) The goal of the analysis was to compare the change in each contractor's spread, relative to Masco, during the conspiracy period. (*Id*.) Based on that comparison, Dr Leitzinger concluded that the alleged conspiracy had a clear and discernible impact on the 377 plaintiffs in this case. **[*12]** [3] (*Id*. at PP 7, 109, 117.)

> 3  In interpreting his findings, Dr. Leitzinger included a measure of the relative likelihood that any changes were due to random chance. (Leitzinger Report [434-2] at P 7.) He found that probability to be "sufficiently low" to indicate a genuine change in market behavior. (*Id*. at P 110.)

Dr. Leitzinger's methodology is "recognized by the courts and in economic literature" as an acceptable method to examine the effect of price fixing conspiracies. (*Id*. at PP 103-07.) That is an important indicator of its reliability. [4] Indeed, even Masco's expert acknowledges that the "before-after approach utilized by Dr Leitzinger is in itself an appropriate statistical methodology." (Rubinfeld Re-

port at P 13, attached to Pls.' Opp'n to Summ. J. [446] at PA 639.) [5] Moreover, there are no apparent flaws in Dr Leitzinger's methodology, and Masco has failed to articulate any methodological problems that would warrant exclusion of Dr Leitzinger's testimony.

> 4 The Supreme Court has identified several non-exclusive factors that a court may consider when evaluating whether a particular theory or study is reliable: (1) whether the theory in question can be and has been empirically tested; [*13] (2) whether the theory has been subjected to peer review and publication; (3) the theory's known or potential error rate; and (4) whether the theory is generally accepted in the field. *Daubert*, 509 U.S. at 592-95. The pertinence of those factors "depend[s] on the nature of the issue, the expert's particular expertise, and the subject of his testimony." *Kumho Tire*, 526 U.S. at 150.
> 5 For consistency, the Court will refer to the documentary evidence produced by plaintiffs by the page number of the document in Plaintiffs' Appendix ("PA").

Masco's primary challenge to Dr. Leitzinger's methodology concerns his definition of the conspiracy period. (Def.'s Mem. to Exclude [434-8] at 12.) According Masco, Dr. Leitzinger "arbitrarily picked his 'base' and [conspiracy] years without any evidentiary basis." (*Id.*) As an initial matter, this argument challenges not Dr. Leitzinger's methodology, but a factual premise behind his analysis. "As a general rule, the factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility." *Bonner v. ISP Techs., Inc.*, 259 F.3d 924, 929 (8th Cir. 2001) (quoting *Hose v. Chicago Nw. Transp. Co.*, 70 F.3d 968, 974 (8th Cir. 1996)). *See* [*14] *also Maiz v. Virani*, 253 F.3d 641, 667 (11th Cir. 2001) (permitting an accounting expert to opine on forensic accounting issues based on "reasonable assumptions regarding the requirements of the applicable contracts") and *In re Polypropylene Carpet Antitrust Litig.*, 178 F.R.D. 603, 623 (N.D. Ga. 1997) (Murphy, J.) (noting that an expert's "assumption that a conspiracy exists does not indicate that the methodology to prove impact in such circumstances is flawed").

In any case, there is sufficient evidence in the record to permit a reasonable expert to define the conspiracy period as Dr. Leitzinger did. The documentary evidence shows that by late 1998 Masco had concluded that industry conditions, particularly a decline in housing starts, threatened to lateralize Masco's price advantage over other contractors. (*See* 1999 Gale [6] Industries, Inc. Strategic Plan & Budget at PA 908-09.) Documents from 1999 suggest that Masco had decided to resist the threatened lateralization via pricing agreements with the manufacturers. (*See* August 19, 1999 Calendar Entry by Jeff Templeton at PA 1415 and May 5, 1999 Email from Jeff Brisley of Knauf at PA 1435.) Later documents support Dr. Leitzinger's assumption [*15] that Masco's efforts resulted in a conspiracy that was ongoing from early 1999 until the first half of 2004. (*See* February 2, 2000 Calendar Entry by Jeff Templeton at PA 1416, March 6, 2000 Email from David Boivin at PA 690; February 28, 2002 Gary Romes' Notes from Meeting with Masco at PA 1460; June 26, 2002 JM Meeting Notes at PA 762; and June 1, 2004 Email from Gary Romes of Guardian at PA 1448.)

> 6 Masco acquired Gale Industries in 1995, but many people in the industry continued to refer to Masco as Gale even as late as 2000. (DeMarie Dep. [509] at 12 and Templeton Dep. [521] at 152.)

Masco also suggests that Dr. Leitzinger's opinion is unreliable because he cannot describe the specific terms of the price fixing agreements that he purports to analyze. (Def.'s Mem. to Exclude [434-8] at 17.) It is not necessary, however, that Dr Leitzinger describe every detail of the alleged conspiracy in order to analyze its potential impact. *See Tuscaloosa v. Harcros Chems., Inc.*, 158 F.3d 548, 564-65 (11th Cir. 1998) (noting that an expert's testimony need not singlehandedly establish a successful conspiracy to be admitted under Rule 702). Dr. Leitzinger's report appropriately focuses on his area [*16] of expertise. *Id.* at 565. To the extent it fails to completely describe or account for the conspiracy, Masco can address this perceived deficiency on cross-examination. [7] *Id.* at 564-65. *See also Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd.*, 326 F.3d 1333, 1345 (11th Cir. 2003) ("The identification of such flaws in generally reliable scientific

Case 1:06-cv-00765-TJM-DRH   Document 320-1   Filed 11/29/09   Page 12 of 30

Page 6

2009 U.S. Dist. LEXIS 30937, *; 2009-1 Trade Cas. (CCH) P76,554

evidence is precisely the role of cross examination.").

> 7   Masco similarly suggests that Dr.' Leitzinger failed to account for alternative explanations that might have affected the spread. (Def.'s Mem. to Exclude [434-8] at 23-24.) Assuming that is true, it is another issue for the jury to consider, not a basis for excluding Dr. Leitzinger's testimony. *See Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd*, 326 F.3d 1333, 1346 (11th Cir. 2003) (noting that an expert's failure to include all "'available flight test parameters in his model'" affected the probative value of the expert's testimony, but not its admissibility).

Finally, Masco contends that Dr. Leitzinger's results are unreliable because he used a "more probable than not standard." (Def.'s Mem. to Exclude [434-8] at 22-23.) The more probable than not standard corresponds with the civil burden **[*17]** of proof in antitrust litigation. *See* McClave and Lanzillotti, *Meeting the Ambiguity Test Under Daubert*, 17 Antitrust 44, 45 (2003) ("In civil antitrust litigation, a jury typically is instructed to find for the plaintiff if the 'preponderance of the evidence' favors the plaintiff's allegations, meaning the allegations are more likely to be true than not."). Moreover, Dr. Leitzinger only used the more probable than not standard to identify all 377 of the contractors that paid a price spread higher than Masco during the conspiracy period. (Leitzinger Report [434-2] at P 108.) In identifying contractors whose spreads increased, he also reported those that satisfy at least a 5% statistical significance test (315), and a 10% statistical significance test (323). (*Id*. at P 109.) His use of these specific sub-categories is not a basis for excluding his testimony as unreliable.

## C. Relevance

In the context of Rule 702, evidence is relevant if it will "assist the trier of fact to understand the evidence or to determine a fact in issue." *Allison*, 184 F.3d at 1310 (citing FED. R. EVID. 702). Masco argues that Dr. Leitzinger's testimony is not relevant because it does not distinguish between lawful **[*18]** and unlawful behavior. (Def.'s Mem. to Exclude [434-8] at 7-10.) Masco also argues that Dr. Leitzinger's data are inconsistent with the conspira-

cy described by plaintiffs. (*Id*. at 18-20.) Neither of these arguments is persuasive.

With respect to the first argument, Masco contends that: "[A]ll that [Leitzinger's] analysis even purports to show is that many contractors paid a higher price relative to Masco during the affected period than they did as compared to the base period." (*Id*. at 11.) That is indeed the thrust of Dr. Leitzinger's analysis. But what Masco fails to acknowledge is that the spread between the prices offered to Masco and the prices offered to other contractors is a key issue in the case. Evidence concerning the spread is thus clearly relevant, although it may not be sufficient in and of itself, to establish an antitrust violation. *Harcros*, 158 F.3d at 564-65 (noting that an expert's testimony need not single-handedly establish a successful conspiracy to be admitted under Rule 702).

Masco's argument that Dr. Leitzinger's data are inconsistent with a class-wide conspiracy is similarly flawed. In support of this argument, Masco cites its own expert's conclusion that Dr Leitzinger's **[*19]** data do not conform to the expected pattern of a class-wide conspiracy. (Def.'s Mem. to Exclude [434-8] at 18-20.) That Masco's expert is able to offer a contrary interpretation of Dr. Leitzinger's data is not at all surprising, and certainly is not fatal to Dr. Leitzinger's analysis. Masco's argument on this point essentially amounts to a battle of the experts that must be resolved by a jury. *Daubert* does not permit the Court to "evaluate the credibility of opposing experts and the persuasiveness of competing scientific studies." *Quiet*, 326 F.3d at 1341.

Dr. Leitzinger's testimony is an important "piece of the puzzle that the plaintiffs endeavor to assemble before the jury." *Harcros*, 158 F.3d at 565. It is thus relevant under Rule 702. Moreover, Masco fails to persuasively challenge either Dr. Leitzinger's qualifications or his methodology. Accordingly, Masco's motion to exclude Dr. Leitzinger's testimony [434] is **DENIED**.

## II. Plaintiffs' Motion for Class Certification

Plaintiffs have filed a motion to certify a class of 377 contractors who purchased insulation products from the manufacturers during the alleged conspiracy period. (Pls.' Renewed Mot. for Cert. [474] at 1.) Plaintiffs had **[*20]** originally sought to certi-

Case 1:06-cv-00765-TJM-DRH   Document 320-1   Filed 11/29/09   Page 13 of 30

Page 7

2009 U.S. Dist. LEXIS 30937, *; 2009-1 Trade Cas. (CCH) P76,554

fy a class that corresponded to a different definition. (Pls.' Original Mot. for Class Cert. [347].) They have since tailored their allegations to reflect Dr. Leitzinger's statistical analysis. (Pls.' Renewed Mot. for Cert. [474] at 1.) Dr. Leitzinger identified the 377 purported class members as contractors who were directly harmed by the alleged conspiracy. (*Id.* and Leitzinger Report [434-2] at PP 108, 117.)

Plaintiffs' motion for class certification is governed by Rule 23 of the Federal Rules of Civil Procedure. *City of Hialeah Rojas*, 311 F.3d 1096, 1101 (11th Cir. 2002) (applying Rule 23). In order to qualify for certification under Rule 23, plaintiffs must show that the proposed class meets all of the requirements of Rule 23(a), and that it falls into one of the categories described in Rule 23(b). *Klay v. Humana*, 382 F.3d 1241, 1250 (11th Cir. 2004).

**A. Rule 23(a)**

Pursuant to Rule 23(a), a class may only be certified if:

> (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; **[\*21]** and (4) the representative parties will fairly and adequately protect the interests of the class.

FED. R. CIV. P. 23(a). The four prerequisites of Rule 23(a) are commonly referred to as numerosity, commonality, typicality, and adequacy of representation. *Valley Drug Co. v. Geneva Pharms., Inc.*, 350 F.3d 1181, 1188 (11th Cir. 2003). They are "designed to limit class claims to those fairly encompassed by the named plaintiffs' individual claims." *Id.* (quoting *Prado-Steiman v. Bush*, 221 F.3d 1266, 1278 (11th Cir. 2000)).

**1. Numerosity**

Rule 23(a)(1) requires that a purported class be so numerous that "joinder of all members is impracticable." FED. R. CIV. P. 23(a)(1). Sufficient numerosity may be established with as few as forty puta-

tive class members. *Cox v. Am. Cast Iron Pipe Co.*, 784 F.2d 1546, 1553 (11th Cir. 1986)("while there is no fixed numerosity rule, 'generally less than twenty-one is inadequate, more than forty adequate, with numbers between varying according to other factors'"). Plaintiffs' putative class of 377 meets the numerosity requirement.

**2. Commonality**

Rule 23(a) (2) requires plaintiffs to show one or more "questions of law or fact common to the class." FED. R. CIV. P. 23(a)(2). **[\*22]** "Typically, questions concerning the existence and scope of an alleged conspiracy will satisfy the commonality requirement." *In re Polypropylene Carpet Antitrust Litig.*, 178 F.R.D. at 612. Courts in the Eleventh Circuit have therefore "consistently held that allegations of price-fixing, monopolization, and conspiracy by their very nature involve common questions of law or fact." *In re Terazosin Hydrochloride*, 220 F.R.D. 672, 686 (S.D. Fla. 2004). *See Klay*, 382 F.3d at 1255 (noting that the existence of a conspiracy and the various defendants' role in it were issues common to all of the plaintiffs) and *In re Commercial Tissue Prods.*, 183 F.R.D. 589, 593 (N.D. Fla. 1998)("Antitrust price fixing conspiracies, by their nature, raise common questions of fact and law about the existence, scope, and effect of the alleged conspiracy.").

The central questions in this case likewise revolve around the alleged conspiracy: specifically, whether a conspiracy existed, and if so, its time frame and scope. Because those questions are common to the class, plaintiffs meet the commonality requirement of Rule 23(a)(2).

**3. Typicality**

Under Rule 23(a) (3), class certification is only appropriate if "the claims **[\*23]** or defenses of the representative parties are typical of the claims or defenses of the class." FED. R. CIV. P. 23(a)(3). Although not required, typicality is generally satisfied if the claims or defenses of the putative class members stem from a single event or a unitary course of conduct, or if they are based on the same legal theory. *Kornberg v. Carnival Cruise Lines, Inc.*, 741 F.2d 1332, 1337 (11th Cir. 1984) (stating that a sufficient nexus is created for typicality purposes "if the claims or defenses of the class and the

Case 1:06-cv-00765-TJM-DRH    Document 320-1    Filed 11/29/09    Page 14 of 30

Page 8

2009 U.S. Dist. LEXIS 30937, *; 2009-1 Trade Cas. (CCH) P76,554

class representative arise from the same event or pattern or practice and are based on the same legal theory").

In this case, all of the proposed class members' claims arise from Masco and the manufacturers' alleged conspiracy to restrain competition in the fiberglass industry. In addition, all of the plaintiffs' claims are based on the same legal theory: that the conspiracy between Masco and the manufacturers violated the antitrust laws. *See In're Domestic Air Transp. Antitrust Litig.*, 137 F.R.D. 677, 698-99 (N.D. Ga. 1991)(Shoob, J.)(noting that a proposed class of antitrust plaintiffs all asserted claims under the theory that defendants "conspired to fix prices [*24] in violation of the antitrust laws"). Plaintiffs therefore meet the typicality requirement.

### 4. Adequacy

In order to satisfy Rule 23(a) (4), plaintiffs must show that "the representative parties will fairly and adequately protect the interests of the class," FED. R. CIV. P. 23(a)(4). This requirement has two prongs: (1) the named plaintiffs must share common interests with the other class members; and (2) the proposed counsel must have the qualifications and experience necessary to represent the class in the litigation. *Piazza v. Ebsco Indus., Inc*., 273 F.3d 1341, 1346 (11th Cir. 2001)("'Adequacy of representation' means that the class representative has common interests with unnamed class members and will vigorously prosecute the interests of the class through qualified counsel.") (*citing Andrews v. Am. Tel. & Tel. Co.,* 95 F.3d 1014, 1023 (11th Cir. 1996)).

All of the proposed class members in this case share a core interest in obtaining relief from Masco's allegedly illegal conduct. The Court is unaware of any conflicts of interest between the named plaintiffs and any other class members. Moreover, the class attorneys have thus far shown that they are capable of providing competent and [*25] effective counsel to the class. They have conducted a successful discovery effort against Masco, and obtained a favorable settlement agreement from the manufacturers. (Scheduling Order [483] and Order [482].) Consequently, plaintiffs have demonstrated adequacy.

### B. Rule 23(b) (3)

In addition to meeting all of the requirements of Rule 23(a), plaintiffs must also show that the purported class falls within one of the subsections of Rule 23(b). *Klay*, 382 F.3d at 1250. Plaintiffs here seek to certify their class under Rule 23(b) (3). (Pls.' Mem. for Cert. [478] at 25-29.) Rule 23(b) (3) "'encompasses those cases in which a class action would achieve economies of time, effort, and expense, and promote uniformity of decisions as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results.'" *State of Alabama v. Blue Bird Body Co., Inc*., 573 F.2d 309, 315-16 (5th Cir. 1978) (quoting the advisory committee notes to FED. R. CIV. P. 23(b) (3) (1966)). It permits certification when: (1) the common questions of law or fact predominate over any questions affecting only individual members; and (2) a class action is superior to other available methods [*26] for the fair and efficient adjudication of the controversy. FED. R. CIV. P. 23(b) (3).

### 1. Common Questions of Law and Fact Predominate

As indicated above, antitrust price-fixing cases by their very nature raise common questions of fact and law concerning the alleged conspiracy. *In re Commercial Tissue Prods*., 183 F.R.D. at 593. In this case in particular, proof of Masco and the other manufacturers' participation in the conspiracy is indispensable to every plaintiff's claim, as is proof of the conspiracy's impact on competition and prices in the fiberglass market. Any individual issues that may arise are overshadowed by the legal and factual questions surrounding the alleged conspiracy on which all liability in this case is premised. *See Klay*, 382 F.3d at 1255 (noting that the determinative factor in establishing predominance under Rule 23(b)(3) is the value of the class-wide issues to each class member's underlying cause of action) and *Ingram v. The Coca-Cola Co*., 200 F.R.D. 685, 699 (N.D. Ga. 2001)(Story, J.) (recognizing that class-wide issues predominate when they have "a direct impact on every class member's effort to establish liability" and ability to obtain relief).

This is particularly [*27] true here because "plaintiffs plan to rely upon evidence of the defendants' conduct, rather than the conduct of individual class members" to establish liability. *In re Polypro-*

Case 1:06-cv-00765-TJM-DRH   Document 320-1   Filed 11/29/09   Page 15 of 30

Page 9

2009 U.S. Dist. LEXIS 30937, *; 2009-1 Trade Cas. (CCH) P76,554

*pylene Carpet Antitrust Litig.*, 178 F.R.D. at 619. Almost all the evidence in this case involves the conduct of Masco and the manufacturers, such that "'the addition or subtraction of any of the plaintiffs to or from the class [should not] have a substantial effect on the substance or quantity of evidence offered.'" *Klay*, 382 F.3d at 1255 (quoting *Blue Bird*, 573 F.2d at 322)). The only evidence that is specific to the individual class members involves their insulation purchases during the alleged conspiracy period. That evidence will likely consist primarily of purchasing records, and might even be amenable to stipulation or reducible to a formula. *Id.* (noting that individualized damages inquiries could accomplished by reference to patient records).

Masco nevertheless suggests that nationwide certification is inappropriate in this case for various reasons that are specific to the insulation market. Masco points out that competition in the insulation industry occurs in discrete, localized markets. (Def.'s Opp'n  **[*28]**  to Cert. [488] at 7.) Masco also notes that fiberglass insulation prices are typically the product of "individualized negotiations." (*Id.* at 11.) According to Masco, generalized proof of injury is impossible when the prices and markets are so diverse. [8] (*Id.* at 12-17.)

8    Masco's related suggestion that the insulation products are themselves diverse is contradicted by evidence in the record that fiberglass insulation is essentially a commodity product, such that insulation sold by one manufacturer is a close or perfect substitute for insulation sold by another. (Leitzinger Report [434-2] at PP 70-73; Boivin Dep. [505] at 11.) *See also Reserve Supply*, 971 F.2d at 39 ("Fiberglass insulation is an essentially homogeneous produce which is marketed in standard sizes, grades ('R-values') and formats.").

The Court is not persuaded by Masco's Market diversity argument. First, it is the conspiracy, and not the market, that must be national in order to warrant nationwide class certification. *See Blue Bird*, 573 F.2d at 321-22 (rejecting plaintiffs' attempt to certify a nationwide class where the evidence only supported wrongdoing in Alabama). The evidence in this case reveals a "'common nucleus of  **[*29]**  operative facts' concerning [an] alleged anti-

trust violation" that was national in scope. *In re Domestic Air Transp. Antitrust Litig.*, 137 F.R.D. at 689. Under the circumstances, the existence of varied local markets does not present an obstacle to certification. *Id.* (finding "no indication that plaintiffs plan[ned] to proceed hub by hub in an effort to present evidence of many different conspiracies").

Moreover, plaintiffs can easily prove class-wide impact in spite of the fact that prices are subject to individualized negotiations. In order to do so, plaintiffs must simply show that the starting price for the negotiations was artificially increased as a result of the conspiracy. *Id.* (noting that inflated fares resulted in an artificial base price, which became the benchmark for discounted or negotiated fares). *See also In re Indus. Diamonds Antitrust Litig.*, 167 F.R.D. 374, 383 (S.D.N.Y. 1996) ("In a number of price-fixing cases concerning industries where discounts and individually negotiated prices are common, courts have certified classes where the plaintiffs have alleged that the defendants conspired to set an artificially inflated base price from which negotiations for discounts  **[*30]**  began.") and *In re Commercial Tissue Prods.*, 183 F.R.D. at 595 (recognizing the same principle). Taken to its logical extreme, Masco's argument would preclude class certification in a price-fixing case in any industry characterized by bargaining or discounting. Courts have been quick to dismiss similar arguments. *Id.*

In short, Masco's liability does not depend on the particulars of the local market, or the substance of individual price negotiations. Instead, Masco's liability hinges almost entirely on the facts surrounding its alleged agreement with the manufacturers to maintain and increase Masco's price advantage over its competitors in the industry. The factfinder's inquiry into that issue can be conducted independently of market variations and individual price negotiations. *See In re Infant Formula Antitrust Litig.*, 1992 U.S. Dist. LEXIS 21981, 1992 WL 503465, at *6 (N.D. Fla. 1992) ("'[C]ontentions of infinite diversity of product, marketing practices, and pricing have been made in numerous cases and rejected. Courts have consistently found the conspiracy issue the overriding, predominant question.'") (quoting *In re Folding Carton Antitrust Litig.*, 75 F.R.D. 727, 734 (N.D. Ill. 1977)).

Finally, the fact that  **[*31]**  there will necessarily be individualized damages evidence does not

2009 U.S. Dist. LEXIS 30937, *; 2009-1 Trade Cas. (CCH) P76,554

preclude Rule 23(b)(3) certification in this case. "[N]umerous courts have recognized that the presence of individualized damages issues does not prevent a finding that the common issues in the case predominate.'" *Klay*, 382 F.3d at 1259 (quoting *Allapattah Servs. v. Exxon Corp*., 333 F.3d 1248, 1261 (11th Cir. 2003)). *See also In re Tri-State Crematory Litig*., 215 F.R.D. 660, 692 (N.D. Ga 2003)(Murphy, J.) ("The requirement of determination of damages on an individual basis does not foreclose a finding of predominance or defeat certification of the class."). Particularly in the antitrust context, "[o]nce [a] violation and its causal relation to plaintiff's injury have been established, the burden of proving the amount of damages is much less severe." *Graphic Prods. Distribs. v. ITEK Corp*., 717 F.2d 1560, 1579 (11th Cir. 1983). Thus, plaintiffs' individualized damages issues will not likely require separate "mini-trials." [9]

> 9   Masco correctly points out that plaintiffs must present some common proof of impact. However, to meet that burden, plaintiffs "need only come forward with plausible statistical or economic methodologies [*32] to demonstrate impact on a class-wide basis." *In re Terazosin Hydrochloride*, 220 F.R.D. at 698. They have done so here, in the form of Dr. Leitzinger's expert economic and statistical analysis, testimonial and documentary evidence, and other circumstantial evidence of impact.

## 2. Superiority

Rule 23(b)(3) lists several non-exhaustive factors that the Court may consider when deciding whether a class action meets the superiority requirement, including: (1) the class members' interest in individually controlling the prosecution or defense of separate actions; (2) the extent and nature of any litigation concerning the controversy which is already commenced; (3) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (4) the difficulties likely to be encountered in the management of a class action. FED R. CIV. P. 23(b) (3). *See also Klay*, 382 F.3d at 1269 (discussing the factors listed in FED. R. CIV. P. 23(b)(3)). With respect to the last factor, the Court must assess whether a class action will create "relatively more management

problems" than any other available alternative, including separate lawsuits by the individual class members.  [*33] *Id*. at 1273.

Class certification clearly is the superior method of handling plaintiffs' claims in this case. The case has already consumed over 10,000 attorney hours and $ 2 million dollars in fees and costs. (Reply Mem. in Supp. of Pls.' Renewed Mot. for Class Certification ("Pls.' Reply for Class Cert.") [493] at 28.) The cost of pursuing independent actions is likely prohibitive for most individual plaintiffs. *See In re Dennis Greenman Sec. Litig*., 829 F.2d 1539, 1545 (11th Cir. 1987) (noting that one "purpose of class actions is to enable parties, who have insufficient means to pursue their individual claims, to pool their resources and pursue their common complaints."). Even if plaintiffs could afford to bring independent actions, those actions would require the individual plaintiffs to present the same evidence, to prove the same conspiracy, on 377 separate occasions. The "burden to the courts would be enormous, and the needless duplication would be extremely expensive for all parties." *DeLoach v. Philip Morris Co., Inc*., 206 F.R.D. 551, 567 (M.D. N.C. 2002). *See also Cameron-Grant v. Maxim Healthcare Servs., Inc.,* 347 F.3d 1240, 1246 (11th Cir. 2003) (explaining that the class [*34] action mechanism is intended to provide "a convenient and economical means for disposing of similar lawsuits" and to facilitate "the spreading of litigation costs among numerous litigants with similar claims").

Masco contends that a class action would be "hopelessly unmanageable" as a result of the individualized evidence that Masco intends to produce to rebut plaintiffs' claims, particularly with respect to damages. (Def.'s Opp'n to Cert. [488] at 49.) However, Masco does not demonstrate how a class action would be any more unmanageable than the alternative: 377 separate lawsuits in which each plaintiff must amass the same evidence regarding an identical conspiracy that allegedly resulted in similar harm to every plaintiff. *See Klay*, 382 F.3d at 1273 (explaining that the relevant inquiry is whether a class action will create "relatively more management problems" than any other available alternative).

In addition, there are a number of management tools available to the Court to address any individu-

Case 1:06-cv-00765-TJM-DRH   Document 320-1   Filed 11/29/09   Page 17 of 30

Page 11

2009 U.S. Dist. LEXIS 30937, *; 2009-1 Trade Cas. (CCH) P76,554

alized damages issues that might arise, including: (1) bifurcating liability and damage trials with the same or different juries; (2) appointing a magistrate judge or special master to preside **[*35]** over individual damages proceedings; (3) decertifying the class after the liability trial and providing notice to class members concerning how they may proceed to prove damages; (4) creating subclasses; or (5) altering or amending the class. *Id.* (citing *In re Tri-State Crematory Litig.*, 215 F.R.D. at 699). These tools are sufficient to handle any manageability problems that may arise in the litigation. Accordingly, plaintiffs' motion for class certification should be **GRANTED**. [10]

> 10   Masco has filed a supplemental brief in opposition to plaintiffs' class certification motion, citing recent cases that emphasize the lower courts' duty to "rigorously analyze" the evidence before certifying a class under Rule 23. (Del.'s Supplemental Br. [586] at 2.) The cases cited by defendant do not announce a new standard of law. *See Gilchrist v. Bolger*, 733 F.2d 1551, 1555 (11th Cir. 1984) (holding that class certification is only appropriate if the Court is satisfied "after a rigorous analysis" that the requirements of Rule 23 have been met). As evidenced by the above discussion, the Court has already applied the requisite "rigorous analysis." Having considered the evidence in the record, including **[*36]** the documentary evidence and the experts' testimony, the Court is satisfied that plaintiffs in this case meet the requirements of Rule 23. *Id.*

### III. Masco's Motion for Summary Judgment

### A. Summary Judgment Standard

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). A fact's materiality is determined by the controlling substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). An issue is genuine when the evidence is such that a reasonable

jury could return a verdict for the nonmovant. *Id.* at 249-50.

Summary judgment is not properly viewed as a device that the trial court may, in its discretion, implement in lieu of a trial on the merits. Instead, Rule 56 of the Federal Rules of Civil Procedure mandates the entry of summary judgment against a party who fails to make a showing sufficient to establish the existence of every element essential to that party's case on which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). **[*37]** In such a situation, there can be no genuine issue as to any material fact, as a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial. *Id.* at 322-23 (quoting FED. R. CIV. P. 56(c)).

The movant bears the initial responsibility of asserting the basis for his motion. *Id.* at 323. However, the movant is not required to negate his opponent's claim. The movant may discharge his burden by merely "'showing' -- that is, pointing out to the district court--that there is an absence of evidence to support the non-moving party's case." *Id.* at 325. After the movant has carried his burden, the non-moving party is then required to "go beyond the pleadings" and present competent evidence designating "specific facts showing that there is a genuine issue for trial." *Id.* at 324. While the court is to view all evidence and factual, inferences in a light most favorable to the non-moving party, *Samples v. City of Atlanta*, 846 F.2d 1328, 1330 (11th Cir. 1988), "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is **[*38]** that there be no *genuine issue of material fact*." *Anderson*, 477 U.S. at 247-48 (1986).

### B. Liability Under the Antitrust Laws

Plaintiffs' claims arise under Section One of the Sherman Act, which prohibits any "contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce," 15 U.S.C. § 1. To show a violation of Section One, plaintiffs must produce evidence of an agreement or concerted activity on the part of Masco and the manufacturers to unreasonably restrain trade. *U.S.*

2009 U.S. Dist. LEXIS 30937, *; 2009-1 Trade Cas. (CCH) P76,554

*Anchor Mfg., Inc. v. Rule Indus., Inc.*, 7 F.3d 986, 1001 (11th Cir. 1993). [11] In order to recover on their Section One claims, plaintiffs must also show that they were damaged by the violation. *Id.*

> 11    Section One also requires that the agreement affect interstate commerce. *See Constr. Aggregate Transp., Inc. v. Florida Rock Indus., Inc.*, 710 F.2d 752, 766 (11th Cir. 1983). Masco does not challenge that element, which is easily met in this case. *Id.* (noting that the interstate commerce element of Section One is satisfied by showing that "the business activities occurred in commerce or that those activities had an effect on commerce").

### 1. Plaintiffs' Horizontal Conspiracy Claims

Plaintiffs  [*39] contend that Masco orchestrated and facilitated an agreement between the manufacturers to maintain and increase Masco's spread in exchange for Masco's agreement to support industry-wide price increases. (SAC [274] at P 2.) An agreement between the manufacturers to so restrain trade would constitute a horizontal conspiracy, which is *per se* unreasonable under the antitrust laws. *See U.S. v. Topco Assocs., Inc.*, 405 U.S. 596, 608, 92 S. Ct. 1126, 31 L. Ed. 2d 515 (1972) (defining a horizontal conspiracy as an "agreement between competitors at the same level of the market structure") and *Cha-Car, Inc. v. Calder Race Course, Inc.*, 752 F.2d 609, 613 (11th Cir. 1985) (recognizing that a horizontal market division is *per se* illegal). Thus, in order to prevail on their horizontal conspiracy claims, plaintiffs need only produce evidence of: (1) an agreement between the manufacturers to restrain trade; and (2) resulting damage. *Todorov v. DCH-Healthcare Auth.*, 921 F.2d 1438, 1455 (11th Cir. 1991) ("In cases where the *per se* rule applies, such as horizontal price-fixing cases, the only inquiry is whether there was an agreement to restrain trade, since the unreasonableness of the restraint is presumed.").

#### a.  [*40] Evidence of an Agreement

Plaintiffs may rely on direct or circumstantial evidence to show an agreement to restrain trade. *Williamson Oil Co., Inc. v. Philip Morris USA*, 346 F.3d 1287, 1301 (11th Cir. 2003). Moreover, an agreement need not be formal or express to support

an antitrust violation. *See Comfort Trane Air Conditioning Co. v. Trane Co.*, 592 F.2d 1373, 1383 (5th Cir. 1979) (holding that an express agreement is not required to prevail on an antitrust claim). However, evidence of "conscious parallelism" in pricing decisions, which is not in itself illegal, is insufficient to support an inference of an illegal agreement in restraint of trade. *Williamson Oil*, 346 F.3d at 1301. *See also Harcros*, 158 F.3d at 571 (noting that oligopolies are often characterized by conscious parallelism). In order to survive summary judgment, plaintiffs must produce evidence that tends to exclude the possibility of synchronous, but independent and thus lawful, behavior on the part of Masco and the manufacturers. *Williamson Oil*, 346 F.3d at 1302 and *Harcros*, 158 F.3d at 570-71 ("evidence of consciously parallel behavior alone leaves the circumstantial evidence in equipoise").

There is no question that  [*41] the insulation manufacturers involved in this case exhibited "conscious parallelism" in their pricing decisions relative to Masco and other independent contractors. Masco's representative, Donny DeMarie, acknowledged that all of the manufacturers maintained a spread between the prices offered to Masco and the prices offered to other independent contractors. (DeMarie Dep. [509] at 16-23, 53.) The manufacturers' representatives confirmed DeMarie's testimony on this point. (Ingwalson Dep. [511] at 40-41 and Templeton Dep. [521] at 131-32.) The documentary evidence suggests that the manufacturers "ha[d] allowed this spread to be a minimum of 12-15% over the years." (June 26, 2002 Notes from JM Meeting at PA 762.)

In addition, plaintiffs have produced a wealth of evidence suggesting that the manufacturers' parallel pricing strategy was not merely the result of lawful, synchronous behavior. [12] First, there are numerous documents in the record reflecting the manufacturers' apparent need to clear pricing decisions with Masco to ensure that those decisions did not violate a formerly agreed-upon spread. In one email exchange, CT executives discussed a plan "to make 31-W (another contractor) a  [*42] proposal at 10-12% above Masco." (July 19, 2002 Email from David Boivin at PA 1268.) The email indicates that, prior to implementing the plan, CT should:

Case 1:06-cv-00765-TJM-DRH   Document 320-1   Filed 11/29/09   Page 19 of 30

Page 13

2009 U.S. Dist. LEXIS 30937, *; 2009-1 Trade Cas. (CCH) P76,554

call Steve Raia, Donny [DeMarie, Masco executives] ... and explain that we are giving a pricing proposal to 31-W that establishes them at a gap we feel is appropriate to Masco as we promised, and we do not want our actions misinterpreted in the market.

(*Id.*) Similarly, Knauf's Vice President wrote in a 2003 email:

I need to complete a phone conversation with Masco leadership before we pull the trigger on this [pricing proposal]. I need you to put the pricing proposal together that you are recommending we take to [the contractor] inclusive of any rebates, volume commitments. Give me something I can say YES to. I will call you after I discuss things with Masco to discern what our risk of becoming visible with [this contractor] is.

(February 5, 2003 Email from Jeff Brisley at PA 735.)

12  Masco argues that some of this evidence is inadmissible hearsay. (Masco Reply Brief [462] at 10-11.) The Court does not agree. As a general matter, the evidence does not qualify as hearsay because it is not being offered to show the truth of the matter asserted, [*43] but rather to show that there was an agreement or conspiracy. *See* FED. R. EVID. 801. In addition, the majority of the evidence is admissible under Rule 801(d)(2)(E), excluding co-conspirator statements from the hearsay rule. *See* FED. R. EVID. 801(d)(2)(E). Finally, many of the documents presented by plaintiffs are admissible as business records under Rule 803(6). *See* FED. R. EVID. 803(6) (permitting a "memorandum, report, record, . . . in any form, of acts, events, conditions, [or] opinions . . . made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity").

Other documents indicate that Masco enforced the spread agreement by communicating directly with the manufacturers, and sometimes demanding price adjustments, when it received reports or otherwise became aware of violations. In one calendar entry, CT executive Jeffrey Templeton notes that he had been informed that Masco "caught OC @ IDI with equal pricing, also 31W." (June 13, 2002 Calendar Entry by Jeffrey Templeton at PA 1302.) A 2002 JM memorandum similarly states that "OC has been found in violation of the spread. Masco has found instances **[*44]** where OC had independents priced at levels that reduced the spread." (June 26, 2002 Notes from JM Meeting at PA 762.) Several documents reference Masco's demand for price adjustments from all of the manufacturers as a result of OC's spread violation. In one such document, Templeton laments that "OC gets caught and we pay with lower revenues. Cost us $ 422,500 a month?" (June 13, 2002 Calendar Entry by Jeffrey Templeton at PA 1302.) JM's documents reflect a similar demand for a price, reduction after Masco learned that OC was selling to other contractors at prices "close" to Masco's. (June 17, 2002 JM Price Request Form Notations at PA 1478.)

There are also a number of documents suggesting that the manufacturers policed the spread themselves by reporting violations directly to Masco. Upon learning of JM's price quote to one independent contractor, a CT executive told his subordinate to "tell Donny [DeMarie] that. JM has dropped a medium sized retail account to within a smidge [sic] of the Masco price. We may need his help to send JM the correct message." (March 20, 2001 Email from David Boivin at PA 1307 and Templeton Dep. [521] at 166-72.) On another occasion, a CT account manager was **[*45]** directed to "make [DeMarie] aware that Wilson is purchasing JM and perhaps they have positioned him very aggressively in that market." (October 9, 2000 Email from Richard Parker at PA 1308-09 and DeMarie Dep. [509] at 146.) CT was likewise aware that if it lowered its relative price to an independent contractor, one of the other manufacturers "would be on the phone to Masco pronto saying CT is not maintaining the increase." (January 29, 2003 Email from Jeffrey Templeton at PA 1313.)

Finally, there are several documents that memorialize discussions between the manufacturers and

Case 1:06-cv-00765-TJM-DRH   Document 320-1   Filed 11/29/09   Page 20 of 30

Page 14

2009 U.S. Dist. LEXIS 30937, *; 2009-1 Trade Cas. (CCH) P76,554

Masco concerning a proposed arrangement whereby Masco would support across-the-board price increases in exchange for a guaranteed spread. In notes taken by Guardian's Gary Romes during a meeting with Mr. DeMarie, Romes states:

> He [DeMarie] is concerned that [with] 1.6 million [housing] starts; there is so much extra capacity on [fiberglass. insulation] batts. Lower prices don't necessarily help them; Masco just wants to maintain a spread with everyone else; as prices go lower that becomes more difficult. They want to maintain a spread at a higher price level - we agreed.

(February 28, 2002 Gary Romes' Notes from **[*46]** Meeting with Masco at PA 1460.) An email written by CT's Vice President of Sales and Marketing echoes the above sentiment, stating:

> What we really need is to convince them [Masco] that they can lead the industry in getting pricing up in the market if we commit to a reasonable gap. I don't know how we do this well without crossing the line on certain antitrust/price fixing rules. It's not about setting a price in a market, it's about making sure we can generate an appropriate return for the investment we make. If all they want is the lowest price they can manipulate from the mfgs. Then there won't be investments made.

(June 21, 2002 Email from David Boivin at PA 1137.) [13]

13   Notes taken by Masco executive Joe Carrington reflect similar negotiations with OC to "guarantee the spread." (March 11, 2004 Notes for Masco Meeting with OC at PA 795-96.) In addition, JM acknowledged its support for Masco's need for the spread in an interoffice memo to new management. (June 26, 2002 JM Meeting Notes at PA 762 and Dudley Colton Dep. [541] at 35-36.)

Following the above discussions, the manufacturers did in fact implement across-the-board price increases. [14] (Templeton Dep. [521] at 222-223; Leitzinger **[*47]** Report [434-2] at PP 97-102.) With regard to those price increases, Knauf's representative observed that: "[b]ecause the Masco companies represent better than half of the installed market, their support of the increase is essential to it sticking. We need this increase desperately. We must see that all of this increase gets passed to everyone," (April 12, 2001 Email from Jeff Brisley at PA 696.) CT's executives similarly noted that they:

> Ha[d] received confirmation of both OC & JM announcing a 10% increase. The early sentiment is that Masco needs to support this in the field, and they need to inform their branches & builders ASAP. There is plenty of skepticism that if Masco is not leading this increase to the builders, it will not stick.

(November 30, 2002 Monthly Report from Mike Clements at PA 1322.) DeMarie's testimony, as well as other documentary evidence, suggests that Masco conditioned its support on an agreement from the manufacturers to maintain or increase the spread. (DeMarie Dep. [509] at 101; April 15, 2001 CT Interoffice Memo by Joseph Quigley at PA 1135.)

14   Documentary evidence reflects identical price changes in very close time frames. (*See* May 23, 2002 Letter from CT **[*48]** at PA 1317; May 15, 2002 Letter from OC at PA 1318; May 20, 2002 Letter from JM at PA 1319; and May 20, 2002 Letter from Guardian at PA 1320; May 29, 2002 Letter from Knauf at 1321.)

In addition to all of the evidence described above, other documents in the record indicate that: (1) Masco passed information between the manufacturers about when the parties could support future price increases (*See* July 31, 2001 Calendar Entry by Jeffrey Templeton at PA 1331 (stating "per Donny [DeMarie] - OC going to announce an increase") and Undated JM Memo at PA 766 ("You can count on our support to get the prices up. You

Case 1:06-cv-00765-TJM-DRH    Document 320-1    Filed 11/29/09    Page 21 of 30

Page 15

2009 U.S. Dist. LEXIS 30937, *; 2009-1 Trade Cas. (CCH) P76,554

can tell my competitors that we are holding firm.")); (2) Masco worked to ensure that the manufacturers held firm to price increases after they were announced, (*See* September 5, 2001 Email from Donny DeMarie at PA 1327 (warning CT that "[i]f Manville [JM] THINKS you did not go up they will not go up") and Templeton Dep. [521] 238-42); (3) Masco's spread increased as a result of the price increases (Templeton Dep. [521] at 237-38, Ingwalson Dep. [511] at 104; Leitzinger Report [434-2] at PP 103-09 & Ex. 20); and (4) the spread decreased in 2004 when two manufacturers broke ties with **[*49]** Masco (*See* June 23, 2004 Email from Brady Adkins of Knauf at PA 321 (referencing JM's break with Masco and stating "we have heard and we have documented pricing erosion due to this market shift") and June 1, 2004 Email from Gary Romes of Guardian at PA 1448 (noting that after the two manufacturers broke ties with Masco, getting "the 'spread back to where it was last year' was unlikely)). All of these documents bolster plaintiffs' claim that Masco facilitated and participated in a horizontal conspiracy to restrain trade in the fiberglass insulation industry. [15]

> 15  In light of the substantial evidence in the record, Masco's reliance on *Williamson Oil* is unavailing. *See Williamson Oil*, 346 F.3d at 1293-94 (upholding summary judgment on an antitrust claim based primarily on a market signal theory). *Blomkest Fertilizer* is similarly inapposite. *See Blomkest Fertilizer, Inc. v. Potash Corp.*, 203 F.3d 1028, 1034-35 (8th Cir. 2000) (finding insufficient evidence of an agreement based on plaintiffs' allegations of sporadic pricing verifications).

### b. Impact

Plaintiffs must also show that they were damaged by Masco's conduct in order to recover on their horizontal conspiracy claims. *See Gulf States Reorganization Group, Inc. v. Nucor Corp.*, 466 F.3d 961, 966 (11th Cir. 2006) **[*50]** ("[P]laintiffs challenging violations of antitrust laws must also show that they have suffered 'antitrust injury'") and *Cable Holdings of Georgia, Inc. v. Home Video, Inc.*, 825 F.2d 1559, 1562 (11th Cir. 1987) ("An antitrust plaintiff must show that he has been damaged and that the antitrust violation alleged is the cause of his injury."). This is often referred to as

"impact" evidence. *Nichols v. Mobile Bd. of Realtors, Inc.*, 675 F.2d 671, 676 (5th Cir. 1982) ("The requirement of the 'fact of damage,' also called 'impact,' means that the antitrust violation must cause injury to the antitrust plaintiff."). The record in this case contains sufficient impact evidence to raise a question of fact for the jury.

After analyzing the relevant market data, Dr Leitzinger found that plaintiffs likely paid higher prices for insulation during the conspiracy period. (Leitzinger Report [434-2] at PP 115-17.) Further, Dr. Leitzinger directly attributed the elevated prices to the agreement between Masco and the manufacturers to maintain and increase Masco's spread. (*Id.*) Masco suggests that Dr Leitzinger's statistical analysis is insufficient to prove impact. However, Masco does not point to any specific **[*51]** flaws or omissions that would invalidate Dr. Leitzinger's conclusions. *See Harcros*, 158 F.3d at 565 ("As circumstantial evidence, [expert]'s data and testimony need not prove the plaintiffs' case by themselves, they must merely constitute one piece of the puzzle that the plaintiffs endeavor to assemble before the jury.") and *Law v. NCAA*, 5 F. Supp. 2d 921, 927 (D. Kan 1998) ("Any evidence which is logically probative of a loss attributable to the violation will advance plaintiffs' case.").

As noted above, plaintiffs also produce evidence that Masco's spread deteriorated, and prices for other contractors correspondingly decreased, almost immediately after two manufacturers backed out of the alleged conspiracy. (*See* July 22, 2004 JM Price Request Form at PA 287 ("With the Masco relationship now broken . . .") and June 23, 2004 Email from Brady Adkins of Knauf at PA 321-23 (documenting price erosion as a result of the break with Masco).) These documents bolster plaintiffs' claim that they paid higher prices for insulation products during the conspiracy period, as a direct result of the spread mandated by the conspiracy.

Finally, impact is evident in this case from a common sense point of **[*52]** view. Construing the evidence in favor of plaintiffs, the conspiracy between Masco and the manufacturers raised the starting point for all price negotiations with independent contractors. Beginning as they did with an artificially elevated floor below which prices could not fall, plaintiffs could only go so far in obtaining a lower price through individual negotiations. It is well-

established that "class plaintiffs may succeed in proving classwide impact by showing that the minimum baseline for beginning negotiations, or the range of prices which resulted from negotiation, was artificially raised (or slowed in its descent) by the collusive actions of the defendants." *In re Commercial Tissue Prods*., 183 F.R.D. at 595. *See also In re Catfish Antitrust Litig*., 826 F. Supp. 1019, 1040-41 (N.D. Miss. 1993) ("[A] consequence of the alleged conspiracy is that the artificial minimum price became the benchmark from which catfish prices were negotiated or discounted.") and *In re Domestic Air Transp*., 137 F.R.D. at 689 (holding that inflated fares resulted in an artificial "base" price that became the benchmark for negotiated fares). Accordingly, Masco's motion for summary judgment on plaintiffs' **[\*53]** horizontal conspiracy claims is **DENIED**.

## 2. Plaintiffs' Vertical Conspiracy Claims

Plaintiffs alternatively assert that Masco entered into a separate agreement with each manufacturer to maintain and increase the spread. (SAC [274] at PP 47-50.) Plaintiffs contend that these "vertical conspiracies" also violated Section One of the Sherman Act. (*Id*.)

The evidence described above is sufficient to raise a question of fact as to whether Masco entered into a series of vertical agreements concerning the spread, and whether plaintiffs were damaged by those agreements. However, to prevail on their vertical conspiracy claims, plaintiffs must produce additional evidence that the vertical agreements resulted in an unreasonable restraint of trade. [16] *Bus. Elec. Corp. Sharp Elec. Corp*., 485 U.S. 717, 735, 108 S. Ct. 1515, 99 L. Ed. 2d 808 (1988) (recognizing that a vertical conspiracy is not generally a per se violation of the antitrust laws). This inquiry is governed by the "rule of reason." *See Graphic Prods*., 717 F.2d at 1568 (applying the rule of reason analysis to a vertical conspiracy claim). In order to survive summary judgment under the rule of reason, plaintiffs must show that the alleged vertical conspiracies had an anti-competitive **[\*54]** effect in the industry. *Id*. at 1572-73. They also must rebut any showing by Masco that the restraints were procompetitive. *Id*.

16   The vertical agreements described by plaintiffs do not include any specified retail price or range of prices. Accordingly, the *per se* rule that applies to vertical agreements that expressly fix prices is not appropriate here. *See Bus. Elec. Corp. V. Sharp Elec., Corp*., 485 U.S. 717, 724, 108 S. Ct. 1515, 99 L. Ed. 2d 808 (1988) ("we have recognized that the scope of *per se* illegality should be narrow in the context of vertical restraints") and *Center Video Indus. Co., Inc. v. United Media, Inc*., 995 F.2d 735, 739 (7th Cir. 1993)(finding no per se violation in the absence of an agreement between the manufacturer and the retailer to "maintain retail prices within a specific range").

Plaintiffs can demonstrate that an agreement had an anti-competitive effect on the market in two ways. First, plaintiffs may prove "actual detrimental effects" on competition. *Levine v. Cent. Florida Med. Affiliates, Inc*., 72 F.3d 1538, 1551 (11th Cir. 1996). Alternatively, plaintiffs can show that the vertical agreements had "the potential for genuine adverse effects" as a result of the conspirators' market power. **[\*55]** *Id*. at 1552. Plaintiffs do not attempt to show that any of the individual vertical conspiracies detrimentally affected competition, or that they had the potential to do so. [17] Instead, plaintiffs argue that the combined effects of the vertical agreements are sufficient to show an adverse effect on competition. (Pls.' Opp'n to Summ. J. [446] at 35-36.)

17   Plaintiffs concede that Dr. Leitzinger did not render an opinion on the effects of the separate, purely vertical agreements between Masco and the individual manufacturers. (Pls.' Opp'n to Summ. J. [446] at 35.)

Several circuit courts have specifically rejected the aggregate approach advocated by plaintiffs. *See Dickson Microsoft Corp*., 309 F.3d 193, 203-204 (4th Cir. 2002) and *PepsiCo, Inc. v. Coca-Cola Co*., 315 F.3d 101, 109-10 (2d Cir. 2002). [18] The plaintiffs in *Dickson* alleged multiple vertical conspiracies between one common defendant and various individual defendants. *Dickson*, 309 F.3d at 203. In spite of the common defendant, the Fourth Circuit refused to imply a single, general conspiracy in the absence of an agreement between or concerted ac-

2009 U.S. Dist. LEXIS 30937, *; 2009-1 Trade Cas. (CCH) P76,554

tion by the non-connected defendants. *Id.* Consequently, the Court found no basis for considering **[*56]** the combined effects of the separate vertical conspiracies to show an anti-competitive effect on the market. *Id.* at 211 ("each . . . agreement must be treated as a separate conspiracy, and only acts taken in furtherance of that alleged conspiracy are appropriately considered in determining the adverse effects of the claimed restraints on trade, not acts of one conspirator taken in furtherance of other possible, distinct conspiracies"). *See also PepsiCo, Inc.*, 315 F.3d at 110 (rejecting plaintiff's "hub and spokes" theory) and *Masco Contractor Serv. E., Inc. v. Beals*, 279 F. Supp. 2d 699, 705 (E.D. Va. 2003) ("in the absence of any allegations of agreements between 'spokes,' a single 'rimless wheel' conspiracy must be evaluated as several individual conspiracies"). [19]

> 18   Although the Eleventh Circuit has not squarely addressed the issue, it has suggested that the aggregate approach advocated by plaintiffs is inappropriate. *See Maris Distrib. Co. v. Anheuser-Busch, Inc.*, 302 F.3d 1207, 1218 (11th Cir. 2002) (refusing to aggregate the market share of all of Anheuser-Busch's distributors in a case involving multiple vertical restraints).
>
> 19   Even those courts that have accepted the "rimless **[*57]** wheel" theory have required an overarching "common design" among the various defendants. *See Impro Prod., Inc. v. Herrick*, 715 F.2d 1267, 1279 (8th Cir. 1983). The only attempt plaintiffs have made to show a "common design" is in relation to their horizontal conspiracy claims.

The Court is persuaded by the reasoning of *Dickson* that there is no basis for considering the combined effects of the multiple vertical conspiracies alleged by plaintiffs in the absence of an agreement between or concerted action by the manufacturers. If plaintiffs are able to show an agreement between the manufacturers, then they will prevail on their horizontal conspiracy claims. In that case, there will be no need to consider plaintiffs' vertical conspiracy claims. On the other hand, if plaintiffs are not able to establish an agreement between the manufacturers, then their vertical conspiracy claims necessarily fail for lack of any evidence that each separate vertical conspiracy had an anti-competitive effect on the market. Accordingly, the Court **GRANTS** Masco's Motion for Summary Judgment [435] as to plaintiffs' vertical conspiracy claims.

## C. Statute of Limitations

As an alternative ground for summary judgment, **[*58]** Masco argues that plaintiffs' claims for damages that occurred before October 19, 2000 are time barred. (Def.'s Mem. for Summ. J. [435-2] at 45-49.) Under the antitrust laws, "'a cause of action accrues and the statute [of limitations] begins to run when a defendant commits an act that injures the plaintiffs' business.'" *Morton's Market, Inc. v. Gustafson's Dairy, Inc.*, 198 F.3d 823, 827 (11th Cir. 1999) (quoting *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 338, 91 S. Ct. 795, 28 L. Ed. 2d 77 (1971)). A plaintiff must file suit within four years of that act in order to assert a timely claim. 15 U.S.C. § 15b.

Plaintiffs claim that Masco's conspiracy with the manufacturers began in January of 1999. (SAC [274] at P 30.) Plaintiffs did not file their claim until October 19, 2004. (*Id.*) Plaintiffs, however, argue that the statute of limitations was tolled from January 1999 through October 2000 because Masco fraudulently concealed its wrongdoing. (Pls.' Opp'n to Summ. J [446] at 46-50.) In order to defeat plaintiffs' tolling argument on summary judgment, Masco must conclusively show that plaintiffs knew about their claim, or that they had sufficient notice to prompt an investigation and would have discovered **[*59]** the claim in the exercise of due diligence. *Morton's Market*, 198 F.3d at 832. Masco has not met that burden here.

In support of its motion, Masco points to one plaintiff's testimony that he knew before 2000 that Masco received favorable prices. (Def.'s Mem. for Summ. J. [435-2] at 49.) It also cites another plaintiff's email that refers to "all of the stories over the years about Gale and the other large organizations entering markets and playing games with pricing." (*Id.*) Although these rumors about Masco's pricing advantages are relevant to the tolling inquiry, they do not establish knowledge as a matter of law. *Morton's Market*, 198 F.3d at 833 (holding that news and publicity surrounding the defendants' confirmed bid rigging conspiracy did not constitute notice of defendant's other misconduct as matter of law).

Case 1:06-cv-00765-TJM-DRH   Document 320-1   Filed 11/29/09   Page 24 of 30

Page 18

2009 U.S. Dist. LEXIS 30937, *; 2009-1 Trade Cas. (CCH) P76,554

Moreover, "the issue of when a plaintiff in the exercise of due diligence should have known of the basis for his claims" is generally a question of fact for the jury. *Id.* at 832 (quoting *Smith v. Duff and Phelps, Inc.*, 891 F.2d 1567, 1572 (11th Cir. 1990)).

In this case, the record evidence concerning plaintiffs' actual or constructive knowledge is not sufficiently determinative  **[*60]** to support summary judgment. Questions of fact remain as to whether plaintiffs knew or should have known about their claims prior to October 2000, and those questions must be resolved by the jury. *Id.* Accordingly, Masco's motion for summary judgment on statute of limitations grounds is **DENIED**.

## IV. Masco's Motion for Sanctions

Masco has filed a motion for sanctions under 28 U.S.C. § 1927. (Def.'s Br. in Supp. of Sanctions [523] at 1-2.) Section 1927 provides that:

> [a]ny attorney . . . who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses and attorneys' fees reasonably incurred because of such conduct.

28 U.S.C. § 1927. Mere negligence is insufficient to warrant sanctions under § 1927. *Schwartz v. Millon Air, Inc.*, 341 F.3d 1220, 1225 (11th Cir. 2003) (quoting *Malautea v. Suzuki Motor Co., Ltd.*, 987 F.2d 1536, 1544 (11th Cir. 1993)). The statute is intended to sanction attorneys who "willfully abuse the judicial process, by conduct tantamount to bad faith." *Id.*

In support of its motion for sanctions, Masco argues that plaintiffs belatedly changed their theory of liability and amended their class  **[*61]** definition, wasting the Court's resources and causing Masco unnecessary trouble and expense. (Def.'s Br. in Supp. of Sanctions [523] at 1-2.) In addition, Masco contends that plaintiffs improperly asserted vertical conspiracy claims in their renewed motion for class certification, although plaintiffs had previously abandoned those claims. (*Id.*) Neither argument is persuasive.

As to plaintiffs' theory of liability, Masco contends that it invested a significant amount of resources and time into defending plaintiffs' initial conspiracy claims, which were limited a plan to impose a specific minimum spread between the prices offered to Masco and the prices offered to other contractors. (*Id.* at 4-7.) According to Masco, plaintiffs' subsequent pursuit of a more amorphous theory involving a non-specific spread vexatiously multiplied the proceedings. (*Id.*) However, neither the original complaint, nor either of the amended complaints, limit the alleged conspiracy to a specified minimum spread. (Compl. [1], FAC [203], and SAC [274].) Instead, the complaints generally allege that Masco and the manufacturers conspired "to raise and fix the prices for residential fiberglass insulation" and "to sell  **[*62]** residential fiberglass insulation to independent contractors at prices that are a significant percentage above those offered to Masco." (*Id.*) This phrasing is equally consistent with a specific spread and a non-specific spread. (*See* Pls.' Resp. [547] at 5.)

Moreover, there is no evidence in the briefs or the record suggesting that plaintiffs committed to a specific minimum spread theory as their only theory of liability. The testimony of plaintiffs' first expert, Dr. Del Roccili, confirms that plaintiffs' conspiracy allegations were not so limited:

> Q. [Defense Counsel] And under what you've called the margin theory of the conspiracy-
>
> A. [Dr. Del Roccili] Yes.
>
> Q. - there is a floor below which no class member generally was allowed to purchase; correct?
>
> A. I think a specific floor may be too - there is an agreement to raise the price that residential contractors pay relative to Masco is what I believe the theory is. Is there a specific floor? I don't think that's exactly it.
>
> Q. Does your theory of common impact depend then upon the spread across the suppliers being the same?
>
> A. No.

2009 U.S. Dist. LEXIS 30937, *; 2009-1 Trade Cas. (CCH) P76,554

(Del Roccili Dep. at 121, attached to Pls.' Resp. [547] at Ex 2.) Dr. Leitzinger's work is consistent with Dr. **[*63]** Del Roccili's with respect to plaintiffs' theory of liability. (Leitzinger Report at PP 103-113.)

With regard to the amended class definition, it is well-recognized that "[t]he act of refining a class definition is a natural outcome of federal class action practice." *In re Domestic Air Transp. Litig.*, 137 F.R.D. at 683. *See also Shin v. Cobb County Bd. of Educ.*, 248 F.3d 1061, 1064 (11th Cir. 2001)(noting the district court's duty to reevaluate class definitions in light of new or changing circumstances). This is particularly true in antitrust cases "where the proof and details of the alleged conspiracy are largely in the hands of the alleged co-conspirators." *Quality Foods de Centro Am., S.A. v. Latin Am. Agribusiness Dev. Corp., S.A.*, 711 F.2d 989, 995 (11th Cir. 1983). As a result, it is not uncommon for a class to change "radically as discovery progresses." *Prado-Steiman*, 221 F.3d at 1273.

In this case in particular, the unfortunate death of Dr. Del Roccili delayed plaintiffs' ability to refine the class definition. Because Dr. Leitzinger had no prior involvement with the case, it took him a considerable amount of time to "master[] the manufacturer databases," "develop a method to **[*64]** compare those prices across different manufacturers," and then produce his report. (Pls.' Resp. [547] at 12.) It was not until plaintiffs received Dr. Leitzinger's report, on September 15, 2006, that they could have possibly proposed a new class definition. (*Id.*)

As soon as plaintiffs received Dr. Leitzinger's report, they submitted a copy to Masco. A month later, plaintiffs notified the Court of their intention to amend the class definition, in accordance with Dr. Leitzinger's findings. (*See* Pls.' Notice of Amending Proposed Class Definition [387].) The month-long delay created a potential problem because plaintiffs' original class certification motion was already pending before the Court when the new analysis was revealed. (*See* Original Mot. to Certify Class [347].) Thus, the Court could have ruled on the original class certification motion without knowing that another class definition was going to be proposed However, plaintiffs explain that the filing was delayed, at least in part, because plaintiffs combined their notice to the Court with their substantive response to Masco's October 4, 2006 preemptive filing. [20] (Pls.' Resp. [547] at 13.) In any event, the relatively brief lapse **[*65]** of time did not unnecessarily multiply the proceedings or cause Masco to incur any additional expense.

> 20    After receiving Dr. Leitzinger's Report and notice of a new proposed class definition, defendants filed an emergency motion notifying the Court of and objecting to a potential change in class definition. (Emergency Motion for Leave to File a Supplemental Br. in Opp'n to Pls.' Mot. for Class Certification [379].) Plaintiffs did not oppose Masco's motion to file a supplemental brief with regard to class certification, and substantive briefing ensued promptly. (Pls.' Resp. to Emergency Motion [381].)

Finally, the Court rejects Masco's suggestion that plaintiffs acted improperly in reasserting their vertical conspiracy claims in their renewed motion for class certification. Plaintiffs' original motion for certification did not specify the claims that the putative class wished to be certified. (*See* Motion to Certify Class [347].) Masco argues that plaintiffs thus abandoned their vertical conspiracy claims by failing to positively assert them in that motion, (Masco's Br. in Supp. of Sanctions [523] at 9-10.) According to Masco, plaintiffs acted improperly and violated this Court's Order **[*66]** when they reasserted their vertical conspiracy claims in their renewed motion for class certification. (*Id.*) The Court does not agree.

Although the original motion for certification does not specify the claims for which plaintiffs sought certification, it requested certification "based on the allegations in the complaint," which clearly encompass vertical conspiracy Claims. (Pls.' Mot. to Certify Class [347] at 2.) In addition, there is other evidence suggesting that plaintiffs always intended to pursue their vertical conspiracy allegations as a class. For example, Dr. Del Roccili testified that the regression methods he proposed could be used for impact whether the conspiracy was identified as horizontal or vertical. (Del Roccili Dep. at 93-95.) Moreover, Masco's class certification expert addressed plaintiffs' vertical conspiracy

2009 U.S. Dist. LEXIS 30937, *; 2009-1 Trade Cas. (CCH) P76,554

theory in his original report, suggesting that Masco understood the theory to be one that plaintiffs planned to pursue as a class. (*See* Kaplan Report at PP 31-32 and 111-12.) Although it might have alleviated some confusion if plaintiffs had more clearly asserted their intention to move forward on their vertical conspiracy claims in their original motion, **[\*67]** their failure to do so does not evidence bad faith.

Masco has not produced any evidence that plaintiffs unreasonably or vexatiously multiplied the proceedings, or that they acted in bad faith, by including their vertical conspiracy claims in their renewed motion for class certification, amending their class definition, or focusing on a slightly different theory of liability. Accordingly, Masco's motion for sanctions is **DENIED**.

**CONCLUSION**

For the foregoing reasons, the Court **DENIES** defendant's Motion to Exclude the **Expert** Testimony of Jeffrey Leitzinger [434], **GRANTS** plaintiffs' **Renewed Motion for Class Certification** [474], **GRANTS in part** and **DENIES in part** defendant's Motion for Summary Judgment [435], **DENIES** defendant's Motion for Sanctions [523], and **DENIES as moot** plaintiffs' Motion for Leave to File a Supplemental Brief in Opposition to the Motion for Sanctions [560].

SO ORDERED, this 9 day of February, 2009.

/s/ Julie E. Carnes

JULIE E. CARNES

CHIEF UNITED STATES DISTRICT JUDGE



LEXSEE 2006 U.S. DIST. LEXIS 83424



Analysis
As of: Nov 27, 2009

**LOVELY H., GLORIA Q., and MICHELE N., on behalf of themselves and
all others similarly situated, -against- Plaintiffs, VERNA EGGLESTON, as
Administrator/Comm. New York City Human Resources Administration,
Defendant.**

**No. 05 Civ. 6920 (LTS)(AJP)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT
OF NEW YORK**

**2006 U.S. Dist. LEXIS 83424**

**November 15, 2006, Decided**

**PRIOR HISTORY:** Lovely H. v. Eggleston, 235
F.R.D. 248, 2006 U.S. Dist. LEXIS 21363
(S.D.N.Y., 2006)

**COUNSEL: [*1]** For Lovely H., individually and
on behalf of all others similarly situated, Gloria Q.,
individually and on behalf of all others similarly
situated, Michele N. individually and on behalf of
all others similarly situated, Plaintiffs: Carolyn
Walker-Diallo, LEAD ATTORNEY, NYC Law
Department, Office of the Corporation Counsel,
New York, NY; Kathleen Mary Kelleher, LEAD
ATTORNEY, Kenneth Richard Stephens, LEAD
ATTORNEY, Richard Elliott Blum, The Legal Aid
Society (NYC), New York, NY.

For Verna Eggleston, as Administra-
tor/Commissioner of the New York City Human
Resources Administration, Defendant: Martha Anne
Calhoun, LEAD ATTORNEY, Emily Sweet, Janice
Casey Silverberg, NYC Law Department, Office of
the Corporation Counsel, New York, NY.

**JUDGES:** LAURA TAYLOR SWAIN, United
States District Judge.

**OPINION BY:** LAURA TAYLOR SWAIN

**OPINION**

*MEMORANDUM OPINION AND ORDER*

In this action Plaintiffs, who assert that they are
welfare recipients with disabilities who reside in
New York City, bring claims under Title II of the
Americans with Disabilities Act (the "ADA"), Sec-
tion 504 of the Rehabilitation Act of 1974 ("the Re-
habilitation Act"), the Due Process Clauses of the
United States and New York State Constitutions,
**[*2]** and various New York State and City civil
rights and social services statutes and regulations,
on behalf of themselves and a class of New York
City welfare recipients with disabilities. On April
19, 2006, the Court granted Plaintiffs' motion to
certify a class and subclass, and granted Plaintiffs'

motion for a preliminary injunction, enjoining the New York City Human Resources Administration ("HRA") from involuntarily reassigning class members' welfare assistance cases to one of three Hub Centers established as part of the WeCARE program.

Plaintiffs now move the Court for an order granting them permission to amend their complaint pursuant to Fed. R. Civ. P. 15(a), permitting the intervention of additional class members as party plaintiffs pursuant to Fed. R. Civ. P. 23(d) and 24(b), and amending the class definition. The Court has jurisdiction of the federal constitutional and statutory claims raised in this matter pursuant to 28 U.S.C. §§ 1331 and 1343 and, as explained in the Court's preliminary injunction and class **[*3]** certification decision, also has supplemental jurisdiction over the related state and local law claims. The Court has considered thoroughly the parties' arguments and submissions. For the reasons that follow, Plaintiffs' motions are granted.

## BACKGROUND

The Court presumes familiarity with the background of this case as detailed in the earlier decision. *See Lovely H. v. Eggleston*, 235 F.R.D. 248 (S.D.N.Y. 2006). Following the Court's April 19,2006, Order, HRA informed the Court of its decision to close the WeCARE Hub Centers and transfer the WeCARE designees' cases back to their neighborhood Job Centers.

## DISCUSSION

### I. *Motion to Amend the Complaint*

Plaintiffs move to amend the Complaint in two respects: first, they seek to amend the Complaint to provide a description of events that allegedly happened to one of the original named Plaintiffs, Gloria Q., after the filing of the Complaint; and second, they seek to add greater specificity to some of the claims in the Complaint regarding HRA's alleged denial of reasonable accommodations at the Job Centers. Plaintiffs argue that these amendments will assist the Court in understanding more fully Plaintiffs' **[*4]** claims and will not unduly prejudice Defendant or delay the litigation. Defendant argues that the amendments would be untimely and unduly prejudicial to Defendant.

Fed. R. Civ. P. 15(a) provides that leave to amend "shall be freely given when justice so requires." "[T]his mandate is to be heeded." *Foman v. Davis,* 371 U.S. 178, 182, 83 S. Ct. 227, 9 L. Ed. 2d 222 (1962).

> If the underlying facts or circumstances relied upon by a plaintiff may be a proper subject of relief, he [or she] ought to be afforded an opportunity to test his [or her] claim on the merits. In the absence of any apparent or declared reason-such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc.-the leave sought should, as the rules require, be 'freely given.'

*Id.* (alterations added).

Clearly, there is no undue delay regarding Plaintiffs' request to update their Complaint with events that have occurred to Gloria Q. since the filing of the Complaint. **[*5]** Defendants also make no argument that this specific amendment would be prejudicial, and the Court sees no reason to believe it will be so. Thus, the request to amend the Complaint with respect to events that have occurred to Gloria Q. since the filing of the Complaint is granted.

The request to amend the Complaint to add greater specificity to some of the claims in the Complaint regarding HRA's alleged denial of reasonable accommodations at the Job Centers is also granted. Although claims regarding denial of reasonable accommodations at the neighborhood Job Centers were not the primary focus of the original Complaint and have not been the focus of the litigation thus far, such allegations were included in the Complaint when it was initially filed. *See* Complaint at P78, alleging that HRA has failed to "adequately train and supervise its staff in local Job Centers regarding the rights of qualified individuals with disabilities, their rights to receive benefits and

2006 U.S. Dist. LEXIS 83424, *

services pursuant to the ADA, and how to provide reasonable accommodations to such individuals"; at P80, alleging that the Job Centers "fail to provide reasonable modifications that HRA specifically requires its [WeCARE [*6]  providers to provide to those participating in WeCARE]"; and P162, requesting that the Court order HRA to "make reasonable accommodations available to class members . . . at their local welfare centers." Therefore, allowing the Plaintiffs to amend the Complaint to provide greater specificity regarding these claims will not unduly prejudice Defendant or delay the litigation. Additionally, the Court finds no evidence of the other conditions outlined in *Foman* that counsel against allowing amendment, such as bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, or futility of amendment. Mindful that leave to amend is to be freely given when justice requires, the Court grants Plaintiffs' motion to amend the Complaint.

## II. *Motion to Add New Party Plaintiffs*

Plaintiffs seek leave to intervene three [1] named Plaintiffs who are class members and who make allegations regarding the denial of reasonable accommodations at Job Centers. They argue that permission to intervene should be granted, as the declarations of these three Plaintiffs present common questions of law and fact, would assist the Court in understanding [*7]  more fully Plaintiffs' claims and would, in fact, assist the Court and the parties in narrowing the scope of discovery. They also argue that intervention would not delay the litigation or prejudice the rights of the original parties. Defendants oppose the intervention, arguing that this case is nearing resolution and that Plaintiffs' motion is untimely.

> 1  Plaintiffs' memorandum of law in support of their motion refers to *three* named Plaintiffs on page 5 and *four* named Plaintiffs on page 9. Because the Plaintiffs' proposed amended class action complaint (attached as an exhibit to their motion papers) adds three named Plaintiffs to the caption, Courtney B., Laura S. and Eula S., and because this appears to be consistent with the declarations attached to their motion papers, the Court assumes that Plaintiffs seek to intervene *three* named Plaintiffs.

Fed. R. Civ. P. 24(b)(2) provides that, upon timely application, anyone may be permitted to intervene in an action [*8]  "when an applicant's claim or defense and the main action have a question of law or fact in common." Rule 24(b)(2) provides that "[i]n exercising its discretion, the court shall consider whether the intervention will unduly delay or prejudice the adjudication of the rights of the original parties." Fed. R. Civ. P.24(b)(2). "Additional relevant factors include the nature and extent of the intervenors' interests, the degree to which those interests are adequately represented by other parties, and whether parties seeking intervention will significantly contribute to full development of the underlying factual issues in the suit and to the just and equitable adjudication of the legal questions presented." *H.L. Hayden Co. of New York. Inc. v. Siemens Medical Systems, Inc.,* 797 F.2d 85, 89 (2d Cir. 1986). Courts in this District have held that Rule 24(b)(2) should be construed liberally. *See Degrafinreid v. Ricks,* 417 F. Supp. 2d 403, 407 (S.D.N.Y. 2006). Fed. R. Civ. P. 23(d) provides that in class actions, the court may make appropriate orders permitting class members "to [*9]  intervene and present claims or defenses."

As noted above, although they have not been the focus of the litigation to date, claims regarding the alleged denial of reasonable accommodations at local Job Centers have been part of the Complaint since the inception of this litigation. The Court concludes that the intervention of the three additional named Plaintiffs will "significantly contribute to full development of the underlying factual issues in the suit and to the just and equitable adjudication of the legal questions presented," *H.L. Hayden Co. of New York, Inc.,* 797 F.2d at 89, and will not unduly delay or prejudice the adjudication of the rights of the original parties Accordingly, Plaintiffs' motion to intervene as named Plaintiffs Courtney B., Laura S. and Eula S. is granted.

## III. *Motion to Amend the Class Definition*

Finally, Plaintiffs seek an amendment of the definition of the certified class. They argue that the changed landscape created by HRA's decision to close the hub centers following the Court's April 19,2006, Order has necessitated such a change. The

2006 U.S. Dist. LEXIS 83424, *

Court originally certified a main class consisting of "recipients of public assistance, **[*10]** food stamps and/or Medicaid who have received or will receive a notice from the New York City Human Resources Administration involuntarily transferring their case to one of three 'hub' centers in Manhattan, the Bronx or Brooklyn in connection with the WeCARE program." *Lovely H.,* 235 F.R.D. at 258. Plaintiffs ask the Court to amend the main class definition to cover "recipients of public assistance, food stamps and/or Medicaid who are or will be designated as participants in the WeCARE program." Defendants argue that this amended definition would substantially broaden the scope of the litigation and point out that any class certified by the Court must meet Rule 23(a)'s requirements of numerosity, commonality, typicality and adequacy of representation.

Fed. R. Civ. P. 23(c)(1)(C) provides that "[a]n order under Rule 23(c)(1) may be altered or amended before final judgment." Because of HRA's decision to close down the Hub Centers associated with the WeCARE program, notifications of involuntary transfers will no longer be sent out. However, as discussed above, class members continue to assert viable claims in this case regarding **[*11]** alleged failure to provide reasonable accommodations at the neighborhood Job Centers. Thus, amending the class definition to focus on designation to WeCARE rather than receipt of a transfer notice is an appropriate action at this time. The Court notes that the requirements of Rules 23(a)

and 23(b)(2) will still be met under this amended definition, for substantially the same reasons the Court outlined in its earlier class certification decision. *See Lovely H.,* 235 F.R.D. at 254-257. Accordingly, Plaintiffs' motion to amend the main class definition is granted. Because the subclass is defined in terms of the main class, there is no need to amend the subclass definition as well.

*CONCLUSION*

For the foregoing reasons, the Court grants the Plaintiffs' motions to amend the Complaint, to intervene three additional named party Plaintiffs and for an amendment of the class definition. Class members Courtney B., Laura S. and Eula S. are granted permission to intervene as named Plaintiffs. The main class definition is amended to be "recipients of public assistance, food stamps and/or Medicaid who are or will be designated as participants in the WeCARE program."

Plaintiffs **[*12]** shall serve and file an amended complaint no later than two weeks from the date of this Order.

SO ORDERED.

Dated: New York, New York

November 15,2006

LAURA TAYLOR SWAIN

United States District Judge