UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

WENDY FLEISCHMAN and CINDY CULLEN,
on behalf of themselves and all others
similarly situated,

                                        Plaintiffs,

        v.                                                      06-CV-0765

ALBANY MEDICAL CENTER; ELLIS HOSPITAL;
NORTHEAST HEALTH; SETON HEALTH SYSTEM;
ST. PETER'S HEALTH CARE SERVICE,

                                        Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

THOMAS J. McAVOY
Senior United States District Judge

## DECISION and ORDER

        Plaintiffs commenced the instant action against Defendants claiming that they conspired amongst themselves to keep down the wages of registered nurses in the Albany area. Presently before the Court are: (1) Defendants' Joint Motion to Exclude Expert Testimony of Orley Ashenfelter [Docket No. 355/358]; (2) Defendants' Joint Motion to Exclude Expert Testimony of Gregory Vistnes [Docket No. 344/356]; (3) Defendants' Joint Motion for Summary Judgment [Docket No. 345]; and (4) Plaintiffs' Motion to Exclude Portions of Expert Testimony of Robert Willig [Docket No. 342/343].

I.       BACKGROUND

Plaintiffs allege that during the class period, June 20, 2002 to June 20, 2006, Defendants entered into at least two restraints of trade in violation of the Sherman Act.  Count I alleges that Defendants engaged in a continuing conspiracy in restraint of trade to depress the compensation of RNs employed at hospitals in the Albany area.  See Docket No. 1.  Count II alleges that Defendants have engaged in a continuing agreement to regularly exchange detailed and non-public information about compensation being paid or to be paid to their RN employees, which not only facilitated the enforcement of the wage suppression conspiracy but unreasonably restrained competition on RN compensation in its own right.  Id.

In a Decision and Order dated July 28, 2008, the Court certified a class of registered nurses with respect to two issues: "whether there has been a violation of antitrust law and whether there has been injury to the class that the Sherman Act was designed to prevent." Fleischman v. Albany Medical Center, 2008 WL 2945993, at *7 (N.D.N.Y. July 28, 2008). Following merits discovery, Plaintiffs moved the Court to amend the prior certification order to additionally certify the issues of impact and damages as to a narrower class of registered nurses. The Court denied Plaintiffs' motion.  All Defendants have settled with Plaintiffs except Albany Medical Center and Ellis Hospital.

Presently before the Court are: (1) Defendants' Joint Motion to Exclude Expert Testimony of Orley Ashenfelter; (2) Defendants' Joint Motion to Exclude Expert Testimony of Gregory Vistnes; (3) Defendants' Joint Motion for Summary Judgment; and (4) Plaintiffs' Motion to Exclude Portions of Expert Testimony of Robert Willig.  The facts as pertinent to each motion are set forth as follows.

### a.      Defendants Ellis and Albany Medical Center's Joint Motion to Exclude Expert Testimony of Orley Ashenfelter

Defendants move to exclude Orley Ashenfelter, who will testify concerning anticompetitive effect, injury-in-fact, and damages.  Ashenfelter "currently serves as the Joseph Douglas Green Professor of Economics at Princeton, where he specializes in labor economics, and was recently elected to serve as President of the American Economic Association."  See Plaintiffs' Opposition Memo. at 3.  He has previously served "as the director of the Office of Evaluation of the U.S. Department of Labor and had testified for the Federal Trade Commission in a variety of antitrust matters."  Id. at 4.

Ashenfelter opines "the fees that Defendants paid for agency nurses, when appropriately adjusted, are equal to or less than competitive staff nurse wages because in a competitive market employees are paid what they are worth."  Plaintiffs' Opposition Memo. at 5.  Ashenfelter selects agency nurses as a benchmark because they are used as a substitute for staff nurses in the workplace and their wages are not set by the Defendant hospitals.

Ashenfelter first determined the rates paid to agency nurses by Defendants during the class period.  He then estimated separate competitive wages by hospital and year and for specialty and non-specialty jobs, shift differentials and on-call status because agency nurse wage rates were separately set for each of these variables.  Next, these rates were adjusted so as to account for the flexibility offered by agency nurses and the additional costs incurred to employ staff nurses such as payroll taxes, workers compensation, human resources costs, and recruitment costs.  Ashenfelter then compared this agency nurse wage benchmark to actual earnings of staff nurses, as reflected in payroll records.  The analysis purports to take into account straight-time, overtime, shift differentials, on-call status, bonuses, and tuition.

Ashenfelter concluded that Plaintiffs and most other staff nurses should have, on average, earned 21% more than they were actually paid.

Ashenfelter also opines that in a competitive market more RNs would have been employed.  Ashenfelter's report explains that underutilization is an anticompetitive effect of the conspiracy to depress RN wages.

Defendants challenge the reliability of Ashenfelter's methodology arguing that it is inadmissible under Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993), and should be excluded from consideration both on summary judgment and at trial.  Specifically, Defendants argue that Ashenfelter's methodology should be excluded because: (1) it is based on an assumption that contradicts his claims of anticompetitive effect, impact, and damages; (2) the "but for wages" do not vary by the experience of the nurse; (3) it is premised on the idea that Defendants made extensive long term use of agency nurses; (4) the "but for wages" are not credible; (5) the rate of employment of nurses in the Albany area is no different from the rate in New York state as a whole; (6) Ashenfelter did not assess whether there was a conspiracy or whether the anticompetitive effects resulted from a conspiracy or some other cause; (7) it applies only to the smaller subclass that the Court rejected; and (8) it is not reliable to prove impact and damages for the two named plaintiffs.[1]

Plaintiffs maintain that Defendants' criticisms are unfounded or go to the weight of the evidence, rather than its admissibility.  Specifically, Plaintiffs respond that Ashenfelter's methodology is reliable and admissible because: (1) he employed widely acceptable and reliable

---

[1] "But-for wages" are the wages which, according to Ashenfelter, staff nurses would have been paid but-for the alleged conspiracy.  The but-for wages were computed using his benchmark methodology.

methods; (2) he properly relied on widely accepted economic principles and peer reviewed materials; (3) his benchmark comparisons reliably show impact and measure damages; (4) Defendants challenge results and not methodology; (5) agency bill rates allow reasonable estimation of competitive staff nurse wages; and (6) the validity of Ashenfelter's benchmark does not depend on whether the use of agency nurses was excessive.

> **b.  Defendants Ellis and Albany Medical Center's Joint Motion to Exclude Expert Testimony of Gregory Vistnes**

Defendants also move to exclude Gregory Vistnes, who will testify that Defendants conspired to suppress nurse compensation or agreed to exchange confidential information for the purpose, or with the effect, of doing so.  "Dr. Vistnes is a Vice President at Charles River Associates, an international economics and business consulting firm." See Plaintiffs' Opposition Memo. at 1.  He has also "served as Deputy Director for Antitrust in the Federal Trade Commission's Bureau of Economics" and "held several positions in the Economic Analysis Group of the U.S. Department of Justice's Antitrust Division, including Assistant Chief of the Economic Regulatory Section." Id. at 1-2.

Although Defendants seek to exclude all of the expert testimony of Vistnes, Defendants specifically dispute the reliability of two opinions; his facilitation opinion and his softened competition opinion.

Vistnes' "facilitation opinion" asserts that "Defendants' information sharing made it easier [for Defendants] to form and maintain a wage-fixing agreement."  See Plaintiffs' Opposition Memo. at 6.  Specifically, it concludes "that direct, regular exchanges of detailed compensation information made it easier for Defendants to coordinate on nurse compensation." Id.  Plaintiffs contend that this opinion is based "on a thorough understanding of the economics

literature on information exchange, . . . and a full examination of the discovery record regarding Defendants' 60+ information exchanges." Id. at 9.

Vistnes' "softened competition opinion" asserts that "the information exchanges in this case . . . reduced Defendants' incentive to compete."   See Plaintiffs' Opposition Memo. at 10. According to Vistnes, a softening of competition "means that competition is reduced, such that Defendants would raise nurse wages less often and in smaller amounts, causing them to hire less often and in smaller numbers." Id. at 13.  The theory purports to contemplate and allow for disparities in pay and employment levels across hospitals.   It contends that softening reduces the hospitals' incentive to raise wages to gain a competitive advantage even if "rivals do not on all occasions immediately or exactly match that hospital's wage increase." Id.  It theorizes that the incentive to increase wages may decrease because a hospital anticipates that the other hospitals will match the increased wages.  This opinion "is based on a careful study of the details of those exchanges and the principles found in the economics literature regarding the competitive effect of information exchanges."   See Plaintiffs' Opposition Memo. at 14-15.

Defendants argue that Vistnes' opinions are neither reliable nor relevant.  Specifically, Defendants argue that Vistnes' facilitation argument is unreliable because: (1) his methodology is not related to the facts of the case; (2) his opinion is connected to the facts of the case only through ipse dixits; and (3) his reliance on the analysis and opinions of Ashenfelter, does not provide a reliable foundation for his conclusion.   See Defendants' Memo. at 7-13.  Defendants argue that Vistnes' softened competition opinion is unreliable because: (1) the opinion is contradicted by the facts; and (2) he failed to link Defendants' information exchanges and any harmful effect on competition.   See Defendants' Memo. at 13-20.

Plaintiffs responds that Vistnes is a highly qualified expert and his opinions are admissible.   Alternatively, Plaintiffs argue that because Defendants challenge only two of Vistnes' numerous opinions, the unchallenged opinions should be admitted even if the Court finds the challenged opinions inadmissible.

### c.    Defendants' Joint Motion for Summary Judgment

Defendants Ellis Hospital ("Ellis") and Albany Medical Center ("AMC") have also filed a joint motion for summary judgment arguing that Plaintiffs "have no evidence of any agreement by Defendants to fix registered nurse compensation, no evidence of parallel wage movements, and no evidence to support Plaintiffs' claim that Defendants' conduct harmed competition or injured the Plaintiffs."[2]  See Defendants' Memo. at 1.

Following extensive merits discovery, the following facts are undisputed.  Albany Medical Center (AMC) is the largest Defendant.  Although there is no formal policy preventing AMC from altering the timing or procedure for setting compensation, RN compensation has traditionally been set in the following way: (1) "AMC establishes the amount of money available to compensate all AMC employees . . . during its annual budget process;" (2) "[i]n approximately August of each year, AMC's human resources department prepares a compensation proposal for the President's Council, a group comprised of AMC's President and CEO and its executive and senior vice presidents;" (3) "AMC's annual compensation proposal addresses all aspects of AMC's compensation for all employees;" (4) "AMC's annual compensation proposal reflects the human resources department's best estimate as to what AMC should budget for compensation for all AMC employees in the coming year"; (5) "AMC's President's Council may

---

[2] In addition to joining Defendants' Joint Motion for Summary Judgment, Ellis has also separately moved for Summary Judgment on alternate grounds. [Docket No. 347/348].

request additional information and make recommendations, which may result in modifications to the initial proposal, typically in September;" (6) "AMC's President's Cabinet can request additional modifications to the proposal as it shapes an annual budget;" (7) "[i]n October or November of each year, AMC's President's Cabinet meets with AMC's CEO to discuss the final budget document to be presented to the Board of Directors;" (8) "[t]he final budget is submitted to the Finance Committee and then to the full Board of Directors for approval in early December of each year;" and (9) "AMC approves the market adjustments and merit increases in December, and they are effective in May of the following year. See Plaintiffs' Response to Defendants' Statement of Undisputed Facts at 3-10.

Ellis hospital is the only Defendant whose nurses are unionized and whose nurse wages are established, at least as to the bargaining unit, through a collective bargaining process with the New York State Nurses Association (NYSNA). See Plaintiffs' Response to Defendants' Statement of Undisputed Facts at 21. When Ellis prepares to negotiate a new collective bargaining agreement, its bargaining objectives and proposals are determined, at least in part, by human resources (HR), the finance department, nursing management, legal counsel, the CEO, and the COO. Id. at 24. The NYSNA and Ellis negotiate until they reach an agreement. Id. at 24-25.

Northeast Health (Northeast) operates two hospitals, Samaritan Hospital in Troy and Albany Memorial Hospital in Albany. Id. at 33. Although there is no formal policy preventing Northeast from altering the timing or procedure for setting nurses compensation, it has traditionally been set as part of an annual budget process in the following way: (1) "[i]n August of each year, each department submits a budget request, which includes a compensation component, to the finance department;" (2) "[i]n September and early October, department

administrators and the finance and human resources departments refine the budget requests;" (3) [i]n mid-October, Northeast's executive vice presidents consider the budget recommendations and decide on the need for a market adjustment;" (4) "[i]n mid-October, Northeast's human resources committee of the board reviews the budget recommendations;" and (5) "Northeast's finance committee of the board reviews and makes a final recommendation on the overall budget to the board of directors, and the board approved the budget in late November or early December." Id. at 33-36.

Seton Health System (Seton) is a member of Ascension Health, the nation's largest not-for-profit health care system and is the smallest Defendant. Id. at 41. "Each year as part of the budget planning process, Seton budgets a certain amount of funds for possible market adjustments." Id. at 43. "Seton's budget process changed midway through the class period - in 2002 and 2003, Seton's fiscal year began January 1, and it established the budget the summer before; in 2004, Seton changed its fiscal year to begin July 1, and it reviewed employee compensation twice, in the summer of 2003 and in January 2004; and from 2005 forward, Seton's fiscal year began July 1, and its budget process began in January." Id. 43-44. Establishing RN compensation involves the human resources department, department directors, and nursing administrators as well as other executives. Id. at 44. The budget committee must approve all market adjustment proposals. Id. at 46.

St. Peter's Hospital (St. Peter's) has been recognized twice as one of the top 100 hospitals in the nation. Id. at 56. Although there is no formal policy preventing St. Peters from altering the timing or procedure for making market adjustments, they have traditionally been set in the following way: (1) "St. Peter's sets its budget for market adjustments in September or October and makes market adjustments in the spring;" (2) "[d]uring the annual budget process,

St. Peter's sets aside a pool of money to use for market adjustments and divides the pool among those job titles where an adjustment is required;" (3) "St. Peter's human resources department makes a recommendation to the director and vice president of human resources regarding the amount St. Peter's should budget for market adjustments;" (4) "[t]he director and vice president of human resources then make a recommendation to the finance committee, which determines the amount of money to be given for the market adjustment." Id. at 57-60.

It is also undisputed that from 2003 through 2006 Defendants engaged in information exchanges regarding the compensation they paid to RNs. See Plaintiffs' Opposition Memo. at 3 n. 6 (Plaintiffs point to 60 documented instances but contend that based on the many surveys produced in discovery there were many more undocumented information exchanges conducted by telephone or in person. Furthermore, incomplete e-mail trails evidence that custodians deleted e-mails.) The parties dispute the purpose and scope that these exchanges played and the role they played in setting nurses wages. The record shows that the hospitals extensively shared information through group communications, e-mails, telephone calls, and in person conversations with the other defendants. See e.g. Plaintiffs' Response to Defendants' Statement of Undisputed Facts at paragraphs 8, 18, 21, 23, 25, 49, 71, 72, 97, 103, 106, 130, 137; see also Ex. 23 (in March 2005, John Barnett of Ellis shares Ellis' current and future new graduate rate with Cathy Halakan of AMC) (a June 2005 e-mail from Sandra Castilla of AMC to Louise Franz of Ellis asking for and obtaining updated information on Ellis' wage and compensation practices including RN new hire and per diem rates) (in May 2004 Louise Franz of AMC sent an internal e-mail reporting that she receiving information from St. Peter's about St. Peter's current wage structure and its plan to move to a different model in June). These communications also included one-to-one email communications and one-to-one verbal

discussions. Id.; see e.g. Ex. 25 (Louise Franz of AMC asked Kathleen Occhiogrosso for Seton for Seton's new RN rate and also provides AMC's new rate).  Defendant collected the information on compensation and benefits gathered from other hospitals and complied reports and surveys which were shared with other defendant hospitals.  Id.  Additionally, "if a request for compensation information was sent out to a group of hospital HR representatives via e-mail, some of them simply replied to the entire group . . . to share their hospitals current compensation information with the other hospitals."  Id.  There are also evidence of information sharing regarding merit and recruitment bonuses, tuition assistance, merit pay, health insurance co-payments, length of workweek, and loan forgiveness programs.  Id.; see e.g. Ex. 25 (Erin Baker of St. Peter's provides Sandra Castilla of AMC with RN new hire, RN per diem rates, and merit increase information after Castilla stated that she needed updated information for AMC's 2006 Compensation and Benefits Budget).

Plaintiffs' argument is as follows.  See Plaintiffs' Opposition Memo. at 1-2.  During the class period, Defendants faced a serious nursing shortage.  A nursing shortage should have led to intense competition for nurses.  Instead, Defendants avoided competing by regularly sharing their most sensitive information about their nurse pay structure.  Defendants would not have shared this information if their competitors used the information competitively to identify low paying hospitals and outbid them to attract more and better qualified nurses.  Plaintiffs, therefore, maintain that the practice continued only because it was accompanied by an agreement and recognition that the exchanged information would not be used as a strategic asset to compete for nurses, but rather to coordinate on wages and ensure that any incentive to compete was eliminated.

Defendants respond as follows.   The process for setting compensation was based on a review of published survey data and internal analysis of compensation and employee needs. During the class period, nurse compensation was steadily increased and as a result, employment levels also increased.   Defendants argue that they are entitled to summary judgment because Plaintiffs: (1) cannot show an agreement to fix nurse pay; (2) cannot establish that Defendants' exchange of compensation information unreasonably restrained competition; (3) have no evidence of harm to competition or injury; and (4) cannot show a causal link between Defendants' information exchange and either the alleged anticompetitive effects or their alleged injury.  Plaintiffs oppose Defendants' motion arguing that: (1) no formal agreement is required and there is extensive evidence for circumstantial proof of a per se claim; (2) they have produced evidence of an actual adverse effect on competition resulting from the information exchanges; and (3) their expert Ashenfelter has presented a legally appropriate benchmark analysis.

### d.   Plaintiffs' Motion to Exclude Portions of Expert Testimony of Robert Willig

Plaintiffs also move to exclude portions fo the expert testimony of Robert Willig.  They argue that "Willig should be limited to testifying as to matters where his expert knowledge can assist the jury in understanding the evidence" and the Court should prohibit Willig from offering any opinion concerning: (1) "[w]hether the fact discovery record in this case is probative or not of the alleged conspiracy; and (2) "[t]he information the Defendants did or did not consider in making their compensation decisions, and the effect or lack of effect particular information had on such decisions." See Plaintiffs' Memo. at 6-7.  Defendants oppose this motion.  They maintain that Willig's testimony satisfies the requirements of admissibility under Rule 702 of the Fed. R. Evidence and, thus, should not be excluded. See Defendants' Opposition Memo. at 1.

II.      **STANDARD OF REVIEW**

a.      **Admissibility of an Expert**

Rule 702 of the Federal Rules of Evidence, which governs the admissibility of expert

and other scientific or technical expert testimony, provides as follows:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

The Supreme Court interpreted the District Court's function under Rule 702 in Daubert

v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993).  The Second Circuit reiterated this

function in Amorgianos v. National R.R. Passenger Corp., 303 F.3d 256, 265 (2d Cir. 2002)

stating:

> [t]he Supreme Court has made clear that the district court has a "gatekeeping" function under Rule 702 - it is charged with "the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." Id. at 597, 113 S. Ct. 2786; accord Campbell, 239 F.3d at 184; Federal Judicial Center, Reference Manual on Scientific Evidence 11 (2d ed.2000).  In fulfilling this gatekeeping role, the trial court should look to the standards of Rule 401 in analyzing whether proffered expert testimony is relevant, i.e., whether it " 'ha[s] any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.'" Campbell, 239 F.3d at 184 (quoting Fed. R. Evid. 401) (alteration in original). Next, the district court must determine "whether the proffered testimony has a sufficiently 'reliable foundation' to permit it to be considered." Id. (quoting Daubert, 509 U.S. at 597, 113 S. Ct. 2786). In this inquiry, the district court should consider the indicia of reliability identified in Rule 702, namely, (1) that the testimony is grounded on sufficient facts or data; (2) that the testimony "is the product of reliable principles and methods"; and (3) that "the witness has applied the principles and methods reliably to the facts of the case." Fed. R. Evid. 702. In short, the district court must "make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." Kumho Tire, 526 U.S. at 152, 119 S. Ct. 1167.

District courts consider various factors in determining reliability: (1) "whether a theory or technique can be (and has been) tested;" (2) "whether the theory or technique has been subjected to peer review and publication;" (3) a technique's "known or potential rate of error," and "the existence and maintenance of standards controlling the technique's operation;" and (4) whether a particular technique or theory has gained "general acceptance" in the relevant scientific community.  See Amorgianos, 303 F.3d at 266.  "These factors do not constitute a . . . definitive checklist or test, [r]ather, '[t]he inquiry envisioned by Rule 702 is . . . a flexible one, . . . and the gatekeeping inquiry must be tied to the facts of a particular case.'"  Amorgianos, 303 F.3d at 266 (citing Kumho Tire, 526 U.S. at 150); see also Daubert, 509 U.S. at 593.  "In undertaking this flexible inquiry, the district court must focus on the principles and methodology employed by the expert, without regard to the conclusions the expert has reached or the district court's belief as to the correctness of those conclusions."   Amorgianos, 303 F.3d at 266; see Daubert, 509 U.S. at 595.  That being said, "conclusions and methodology are not entirely distinct from one another" and "[a] court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." Amorgianos, 303 F.3d at 266 (quoting General Elec. Co. v. Joiner, 522 U.S. 136, 146 (1997)); see Heller v. Shaw Indus., Inc., 167 F.3d 146, 153 (3d Cir.1999) ("[A] district court must examine the expert's conclusions in order to determine whether they could reliably follow from the facts known to the expert and the methodology used.").  "Once the district court has deemed the evidence sufficiently reliable so as to be admissible, it is "bound to consider the evidence in the light most favorable to plaintiff" when deciding motions for summary judgment or judgment as a matter of law." In re Joint Eastern & Southern Dist, Asbestos Litigation, 52 F.3d 1124, 1135 (2d Cir. 1995).

####    b.    Summary Judgment

Summary judgment, pursuant to Fed. R. Civ. P. 56(c), is warranted if "the pleadings,

depositions, answers to interrogatories, and admissions on file, together with the affidavits, if

any, show that there is no genuine issue as to any material fact and that the moving party is

entitled to a judgment as a matter of law."  The party moving for summary judgment bears the

initial burden of showing, through the production of admissible evidence, that no genuine issue

of material fact exists.  Major League Baseball Properties, Inc. v. Salvino, 542 F.3d 290, 309 (2d

Cir. 2008).  Only after the moving party has met this burden is the non-moving party required to

produce evidence demonstrating that genuine issues of material fact exist.  Salahuddin v. Goord,

467 F.3d 263, 272-73 (2d Cir. 2006).  The nonmoving party must do more than "rest upon the

mere allegations ... of the [plaintiff's] pleading" or "simply show that there is some metaphysical

doubt as to the material facts."  Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S.

574, 585-86 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986); see also Fed.

R. Civ .P. 56(e) ("When a motion for summary judgment is made [by a defendant] and supported

as provided in this rule, the [plaintiff] may not rest upon the mere allegations ... of the [plaintiff's]

pleading ....").  Rather, "[a] dispute regarding a material fact is genuine if the evidence is such

that a reasonable jury could return a verdict for the nonmoving party."  Ross v. McGinnis, 00-CV-

0275, 2004 WL 1125177, at *8 (W.D.N.Y. Mar. 29, 2004) [internal quotations omitted] [emphasis

added].  It must be apparent that no rational finder of fact could find in favor of the non-moving

party for a Court to grant a motion for summary judgment.  Gallo v. Prudential Residential Servs.,

22 F.3d 1219, 1223-24 (2d Cir. 1994); Graham v. Lewinski, 848 F.2d 342, 344 (2d Cir. 1988).

In determining whether a genuine issue of material fact exists, the Court must resolve all

ambiguities and draw all reasonable inferences against the moving party.  Schwapp v. Town of Avon, 118 F.3d 106, 110 (2d Cir. 1997) [citation omitted]; Thompson v. Gjivoje, 896 F.2d 716, 720 (2d Cir. 1990) [citation omitted].

## III.      DISCUSSION

### a.     Defendants' Ellis and Albany Medical Center's Joint Motion to Exclude Expert Testimony of Orley Ashenfelter

Plaintiffs employed Orley Ashenfelter to use "standard economic tools to study whether staff nurses in this action suffered impact and damages as a result of Defendants' alleged conspiracy."  See Plaintiffs' Opposition Memo. at 4.  Ashenfelter compared actual wages paid to staff nurses by the Defendant hospitals during the alleged conspiracy with wages that would be paid "but-for" the alleged conspiracy.  Ashenfelter computed the "but-for" wages of staff nurses by using bill rates for agency nurses as a benchmark with which to compare staff nurse wages during the same period.  He maintains that agency nurses "are an appropriate benchmark because: (1) agency nurses, as literal substitutes for staff nurses, perform the work that would otherwise be done by a staff nurse;" and (2) their bill rates, set by a national market, would not have been affected by the alleged conspiracy.  Plaintiffs' Opposition Memo. at 2.  Ashenfelter determined that "Plaintiffs, and most other staff nurses, had indeed suffered injury as a result of Defendants' alleged collusive wage suppression."  Id. at 2-3.  He concluded "that, on average, staff nurses had earned $28.11 per hour during the class period, but that in a competitive market, they would have earned an average of at least $35.74 per hour."  Id. at 7.

Defendants argue that Ashenfelter's testimony should be excluded because it is unreliable as a matter of law.  They do not challenge Ashenfelter's qualifications or the relevance

of his testimony.  Defendants instead challenge the reliability of his opinions, arguing that: (1) his benchmark theory is based on assumptions and is disconnected from the facts; (2) he failed to address whether a conspiracy existed and whether that conspiracy caused the wage suppression; and (3) his utilization theory does not take into consideration New York state specific conditions.  The Court will address these arguments seriatim.

### 1. Whether the Methodology Used by Prof. Ashenfelter in Forming his Benchmark Theory is Reliable

The methodology used by Ashenfelter to determine that agency nurse bill rates and staff nurse wages should be comparable is based on the widely accepted economic concept of marginal revenue product (MRP).  MRP is the "value that an employee creates for his or her employer."  The concept promulgates that an employer will not "incur costs to employ a staff nurse or hire an agency nurse that, in total, exceed a nurses' [MRP]."  In other words, according to economic theory, Ashenfelter opines that because agency nurses "are interchangeable with staff nurses, working instead of, and alongside, staff nurses at the exact same hospitals performing the exact same tasks on the same day" the two types of nurses are worth the same to the hospitals.

Ashenfelter explains that agency nurse bill rates and staff nurse wages differ because agency bill rates "pay for all the costs of employing an agency nurse, not just her wages, and include an amount to compensate the agency nurse for scheduling flexibility."  Staff nurse wages are usually lower than agency nurse bill rates because they do not include this flexibility premium and fail to account for fringe benefits and other costs of employing a full time employee.  Ashenfelter's methodology purports to adjust the competitive agency bill rate to account for these variables.  He opines that the "but-for" wages of staff nurses will equal the MRP of the

agency nurse minus the value of the flexibility.[3]   Conversely, the competitive wage of a staff nurses equals the MRP of the staff nurse minus the "non-earning costs of employing that nurse." From these economic computations, Ashenfelter opines that he is able to determine the extent to which Defendants' alleged conspiracy affected the wages of staff nurses during the class period.

The validity of the economic concept MRP is not challenged by the Defendants. Ashenfelter based his methodology on this accepted economic principle.  His methodology took into consideration the flexibility premiums offered by agency nurses, staff nurse fringe benefits, and the costs of employing full time staff nurses and he took the necessary logical steps from agency bill rates to estimate the competitive wage of individual staff nurses.

Similarly, Defendants do not challenge the data used by Ashenfelter to compute the "but-for" wages.  The but-for wages are computed using wage and pay-roll data and differences in pay grade depending on on-call status and specialty placements at each of the Defendant hospitals during each year of the class period.  The underlying data applied to the methodology to compute "but-for" wages is undisputed.

Defendants argue that Prof. Ashenfelter's methodology is unreliable because: (1) it assumes that agency nurse rates are set in a national market; (2) it does not account for differences in experience; (3) it is based on the assumption that Defendants made extensive long term use of Agency nurses; (4) the but-for wages created by his methodology are not credible; (5) the but-for wages barely change over the class period; (6) the methodology can only

---

[3] "But-for wages" are the wages that Ashenfelter opines the staff nurses would expect to be paid in the absence of the alleged conspiracy.

be applied to a subset of the nurses; and (7) the methodology cannot prove impact and damages for the two named plaintiffs.

### a.   **Agency Nurse Wages are Set in a National Market**

Defendants argue that Ashenfelter has "no basis to believe that there is any connection between the adjusted bill rates for agency nurses and the competitive wages of staff nurses." Defendants' Memo. at 7-8.  Defendants contend that wages for the two groups must be set in the same market for agency nurses to be properly used as a benchmark.  They argue that because (1) Ashenfelter's methodology assumes that wages for agency nurses are set in a national market; and (2) Ashenfelter has stated that the Defendant hospitals would have little influence over the national market for staff nurse wages, he in effect acknowledges either that there is no link between agency nurse's and staff nurse's wages or that Defendants have no power to suppress wages.[4]

Plaintiffs argue that the MRP theory does not require that staff nurse wages be set in the same market as agency nurse bill rates because "what matters is that the bill rate is equal to or less than the marginal revenue product of an agency nurse."  See Plaintiffs' Opposition Memo. at 14.  They further claim that after proper adjustments, his methodology computes the actual competitive wage of the staff nurse based on the staff nurses' economic worth to the hospital.  The fact that Defendants dispute Ashenfelter's methodology does not render the methodology unreliable.  Experts are entitled to differing opinions as to the validity of the methodology, so long as the challenged methodology is grounded in reliable scientific principles and facts.  See McCullock v. H.B. Fuller Co., 61 F.3d 1038, 1044 (2d Cir. 1995), ("[d]isputes as

---

[4]  Ashenfelter acknowledges that Defendant Hospitals are too small to have any influence over staff nurse wages in the national market.

to . . . faults in [expert's] use of [particular scientific analysis] as a methodology . . . go to the weight, not the admissibility, of his testimony."). Because the Court has already concluded that Ashenfelter's methodology is based on a well accepted economic principle and uses undisputed data, exclusion is not warranted.

b. **Methodology does not take into account Experience**

Defendants argue that work experience is not accounted for in Ashenfelter's methodology because agency nurse bill rates do not vary by experience and, therefore, "but-for" wages do not vary. They allege this overcompensates starting nurses and under compensates the most experienced nurses, rendering the methodology unreliable. See Defendants Memo. at 11-12.

Plaintiffs respond that "Ashenfelter took into account all available data, which allowed him to account for differences in competitive wages based on job type, hospital, year, shift differential, and on-call status." Plaintiffs' Memo. at 17. "The benchmark does not account for experience because the data [is] not available." Id. They maintain that the available data allows for a "conservative estimate of impact and damages based on a customized and highly comparable benchmark methodology." Id.

"Damages in antitrust cases 'are rarely susceptible to the kind of concrete, detailed proof of injury which is available in other contexts.'" Litton Systems, Inc. v. American Tel . and Tel. Co., 700 F.2d 785, 823 (2d. Cir. 1983)(quoting Zenith Radio Corp. v. Hazeltine Research, Inc., 395 U.S. 100, 123 (1969)). In Litton Systems, Inc., 700 F.2d at 823-24, the Second Circuit determined that "where there is a basis on which a jury can reasonably infer significant antitrust injury, [the court] should be very hesitant before determining that damages cannot be awarded." In Litton Systems, Inc., 700 F.2d at 823-24, the Second Circuit upheld the consideration of

expert testimony which was based on assumptions about the size of the market and a company's share in that market.  The court found that the estimates were based upon analysis of the industry data and a review of other studies and that the projections made were conservative.  Id.  "An antitrust plaintiff must provide only sufficient evidence to support a 'just and reasonable estimate' of damages."  U.S. Football League v. National Football League, 842 F.2d 1335, 1378 (2d Cir. 1988) (quoting Bigelow v. RKO Radio Pictures, Inc., 327 U.S. 251, 264 (1946)); see also Story Parchment Co. v. Paterson Parchment Paper Co., 282 U.S. 555, 563 (1931) (proof of antitrust damages sufficient "if the evidence show[s] the extent of the damages as a matter of just and reasonable inference, although the result be only approximate.").  A benchmark need not be perfect to allow for this reasonable estimate of damages.  See McDonough v. Toys R Us, Inc., 638 F. Supp.2d 461, 491 (E.D. Pa. 2009) ("His proposed benchmarks are not perfect, but they will give a reasonable estimate of damages." (internal citations omitted)).

Here, only the named Plaintiffs are pursuing damage claims and both named Plaintiffs are experienced nurses.  Therefore, the critique that Ashenfelter's methodology may overcompensate inexperienced nurses is irrelevant.  Ashenfelter's methodology is reliable for reasonably estimating the damages for the two named plaintiffs based on a variety of variables specific to those Plaintiffs.

### c.  No Evidence of Extensive Agency Use

Defendants next argue that "although Prof. Ashenfelter's [methodology] is premised on the idea that the Defendants made extensive long term use of agency nurses, he admits that he cannot distinguish between appropriate long term agency use and inappropriate agency use" and therefore his opinions are unreliable.  Defendants' Memo. at 13.

Plaintiffs respond that Ashenfelter's methodology is not premised on the fact that Defendants made extensive use of agency nurses.  They contend that excessive agency use is merely additional evidence of wage suppression.  Therefore, whether agency usage is considered excessive has no effect on the reliability of Ashenfelter's benchmark analysis.  Furthermore, Plaintiffs argue that Defendants' business documents provide evidence that support the conclusion that agency use was excessive.

### d.  The But-For Wages are not Credible

Defendants also argue that Ashenfelter's methodology should be excluded as unreliable because the but-for wages are not credible and barely change over time.   The Supreme Court in Daubert, 509 U.S. at 595, stated that "the district court must focus on the principles and methodology employed by the expert, without regard to the conclusions the expert has reached or the district court's belief as to the correctness of those conclusions."  The district court however must still "examine the expert's conclusions in order to determine whether they could reliably follow from the facts known to the expert and the methodology used." Heller v. Shaw Indus., Inc., 167 F.3d 146, 153 (3d Cir. 1999); See Joiner, 522 U.S. at 146 ("[C]onclusions and methodology are not entirely distinct from one another. . . [N]othing in either Daubert or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the ipse dixit of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered.").

As previously stated, Ashenfelter's methodology is based on sound economic principles and applies undisputed facts.  Defendants will have the opportunity to cross-examine Ashenfelter at trial as to the credibility of his results and the jury will be able to assign the appropriate weight to the expert's opinions.   The methodology requires a step-by-step

application of undisputed  pay roll information into a methodology which this Court finds to be reliable.   There is no analytical gap between this application and the results found by Ashenfelter.

### 2. Whether Ashenfelter's Opinions are Unreliable because he did not Study Whether a Conspiracy Existed and Whether the Conspiracy Caused the Wage Suppression

Next, Defendants argue that Ashenfelter's opinions are unreliable because he "simply assumed, upon direction from plaintiff's counsel, that the defendants unlawfully conspired either to exchange nurse wage information or suppress nurse wages" and never investigated whether that assumption had merit.  Defendants' Memo. at 20.  They contend that "[t]he Court should not feel comfortable allowing Professor Ashenfelter to offer opinions on anticompetitive effect, impact, and damages flowing from the conspiracy when he did not even investigate whether the conspiracy even existed, or whether, even assuming it did exist, it was the cause of the effects he claims to have found."  Id. at 20-21.

Ashenfelter's opinions focus exclusively on the issues of whether staff nurses suffered impact and damages and he offers no opinions as to liability.  Plaintiffs admit that "[f]or the purposes of his report, Prof. Ashenfelter was asked to assume that Defendants conspired to suppress wages and exchanged wage-related information."  Plaintiffs' Memo. at 4 n. 2. Ashenfelter does not rely on the assumption of liability in determining whether the staff nurses' wages were depressed.  Ashenfelter's methodology focused on undisputed data and facts and was based on well accepted economic theory.  The fact that he did not address whether a conspiracy existed or whether a conspiracy caused the wage suppression does not render his opinions, as to impact and damages, unreliable.

### 3.      Whether Ashenfelter's Underutilization Opinions are Unreliable

Ashenfelter also studied underutilization in Albany hospitals.   Plaintiffs describe underutilization as an "anticompetitive effect of Defendants' conspiracy" and offer it as evidence of Defendants' market power.  To determine whether underutilization was present at Defendant Hospitals, Ashenfelter applied a formula for measuring utilization developed by Kevin Grumbach and others and published in a peer reviewed journal.  When applying this formula:

> Prof. Ashenfelter gathered data on the number of full-time nurses, the average number of inpatient beds filled per day, the volume of outpatient services, and the complexity of services provided.  He found nurse utilization in Albany to be a full 14% lower than in other cities nationwide.  Notably, this estimate is conservative because the utilization measure for Albany includes hospitals that did and did not participate in the conspiracy to suppress wages.

Plaintiffs' Memo. at 7-8.  Professor Ashenfelter's methodology to determine whether Albany nurses were underutilized compared Albany-area utilization of nurses to average nurse utilization in the country as a whole.  Defendants argue that Ashenfelter's nurse utilization analysis is unreliable because it does not take into account state specific factors that affect utilization from one state to another, such as budgetary or funding issues and laws and regulations. Defendant's expert "re-ran [the utilization] analysis using cities in New York state as a benchmark and found no significant difference between Albany's utilization rate and that of other New York cities."  Defendants' Memo. at 19.

Defendants do not attack the methodology Plaintiffs use to determine the utilization rate of nurses or the data used to determine Albany's utilization rate. On the contrary, Defendants apply the same methodology and Albany-specific data when comparing the rate of utilization in Albany to a New York state benchmark.   Defendants here challenge only Ashenfelter's decision to compare utilization in Albany to a national benchmark, as opposed to

a New York state benchmark.  Differences in expert opinion as to which benchmark is more reliable does not render Ashenfelter's opinions unreliable.  Instead Defendants will have the opportunity to cross-examine Ashenfelter at trial as to the effects of state specific factors and the jury will be able to assign the appropriate weight to the expert's opinions.  Because the Defendants fail to challenge the methodology underlying the utilization theory, Ashenfelter's opinion that hospitals in Albany have a lower nurse utilization rate than hospitals nationwide is admissible.

Accordingly, Ashenfelter's opinions regarding impact and damages are admissible.

### b.   Defendants Ellis and Albany Medical Center's Joint Motion to Exclude Expert Testimony of Gregory Vistnes

Plaintiffs have offered Dr. Vistnes to testify in support of their claims that Defendants conspired to suppress nurse compensation or agreed to exchange confidential information for the purpose, or with the effect of, doing so.  Vistnes opines that Defendants' exchange of compensation information facilitated coordination among them and softened competition. Defendants argue that Dr. Vistnes' opinions should be excluded because they are unreliable, unsupported, and contradicted by the facts and evidence produced during discovery.  Although Defendants take issue only with the softened competition and facilitation opinions they contend that all of his opinions should be excluded.  Because Defendants advance no arguments relating to the other opinions they are admissible.

### 1.   Vistnes' facilitation opinion

Dr. Vistnes' facilitation opinion asserts that "the scope of the information that Defendant Hospitals shared, the frequency with which they shared their information, and the

nature of the information that they shared, significantly increase[d] Defendant Hospitals' ability to establish and maintain an agreement to reduce competition for RNs."  Expert Report of Gregory S. Vistnes at 2.  Plaintiffs contend that Vistnes' opinion is based on "a thorough understanding of the economics literature on information exchange and a full examination of the discovery record regarding the exchanges."  Plaintiffs' Opposition Memo. at 9.  He explains that because information exchanges can both benefit and harm competition, expert testimony is necessary to help a jury understand the impact of the particular information exchanges in this case.  Plaintiff's maintain that Vistnes' testimony will explain why his "detailed review of the record led him to conclude that the information exchanges in this case in fact reduced incentives to compete." Plaintiffs' Opposition Memo. at 10.

Defendants argue that this opinion should be excluded as unreliable and unsupported because: (1) the conclusions are related to the facts only through ipse dixit; and (2) Vistnes relied on the analysis and opinions of Plaintiff's other expert in coming up with his own opinion. See Defendants' Memo. at 7, 10 and 12.

### a.  Whether the Conclusions are Related to the Facts

Defendants contend that Vistnes' conclusion - that information exchanges facilitated coordination of nurse compensation - is unreliable because Vistnes offered the opinion without understanding what role the information exchanges played in setting nurse compensation. Defendants allege Vistnes: (1) reached his conclusions without opining as to whether an agreement existed, what such an agreement would contain, and whether coordination actually occurred; (2) failed to distinguish between lawful and unlawful behavior; (3) "failed to examine the processes through which Defendants set their nurse compensation, and did not consider the reality of how, when, and why Defendants made their decisions regarding nurse compensation;"

and (4) did not rely upon any data produced in discovery such as payroll or human resources data.  See Defendants' Memo. at 7-11.  Therefore, Defendants argue that Vistnes "reached his opinions based upon an analysis that he conducted in a vacuum" and "jumped to his conclusions."  Defendants' Memo. at 7-8.

### (1)  Opinion does not Address:  Whether an Agreement Existed, What it Contained, or Whether Coordination Occurred

Plaintiffs argue that Vistnes is entitled to offer limited opinions and is not required to opine as to the ultimate issue in the case.  They argue that Vistnes was not required to testify as to whether a conspiracy existed or whether coordination actually occurred for his opinions to be admissible.  Vistnes' testimony is offered only to opine that the nature, frequency and scope with which Defendants shared information would make it easier for Defendants to establish and maintain an agreement to reduce RN competition.  As a general matter this type of opinion testimony may be helpful to the trier of fact.  See City of Tuscaloosa v. Harcros Chemicals, Inc., 158 F.3d 548, 565 (11th Cir. 1998) ("data and testimony need not prove the plaintiffs' case by themselves; they must merely constitute one piece of the puzzle that the plaintiffs endeavor to assemble before the jury.").

In U.S. Information Systems, Inc. v. International Broth. of Electrical Workers Local Union Number 3, AFL-CIO, 313 F. Supp.2d 213, 240 (S.D.N.Y. 2004), the Court explained that "an expert is permitted to testify that the 'climate' of a specific market was consistent with a conspiracy."  See In re Polypropylene Carpet Antitrust Litigation, 93 F. Supp.2d. 1348, 1355 (N.D. Ga. 2000) (denying in part defendants' motion to exclude plaintiffs' expert testimony because the expert's proposed testimony "that the climate of the polypropylene market during the relevant time period was consistent with a finding that Defendants engaged in a conspiracy

to fix prices" would be "helpful to the trier of fact."). In <u>U.S. Information Systems, Inc</u>,  313 F.

Supp.2d at 240, defendants claimed that the expert's reports and testimony were impermissibly

"replete with conclusions about the existence of a conspiracy based upon conclusions of law."

The court held that although the expert could not testify as to his legal conclusion:

> [h]e could . . . point to factors that would tend to show anticompetitive conduct in a market.  He could not indicate whether he believed those factors existed here, and what the economic significance of those factors would be.  He could also explain how certain conduct could affect a market through the use of hypothetical statements. . .[the expert] could hypothesize that if certain conduct did occur, economists would expect the market to react in a particular way.

<u>Id</u>.

In this case, Vistnes seeks to testify that the information exchanges, engaged in by the

Defendant hospitals, made it easier for Defendants to form and maintain a wage agreement.

This type of opinion maybe helpful to the jury and is admissible.

### (2)  Opinion fails to Distinguish between Lawful and Unlawful Behavior

Defendants contend that "Vistnes' conclusions . . . will not assist the jury to understand

the evidence because his opinions are as consistent with lawful behavior as unlawful behavior."

Defendants' Memo. at 9.  Plaintiffs argue that Vistnes' opinion is offered as evidence probative

of a per-se unlawful wage fixing conspiracy and cannot be  probative of lawful conduct.

See Plaintiffs' Opposition Memo. at 8.

In <u>Williamson Oil Co. v. Phillip Morris U.S.A.</u>, 346 F.3d 1287, 1322 (11th Cir. 2003), the

court excluded some of the expert's testimony because "he did not differentiate between legal

and illegal pricing behavior."  The expert's conclusion was "that plaintiffs participated in an illegal

price fixing conspiracy, and he expressed this opinion . . . by saying that the manufacturer's

participation in the MSA information sharing system created an inference of collusion."  Id at

1323.  The expert defined collusion to include conscious parallelism, which is legal behavior.

Id.  The court excluded the testimony as unhelpful to the jury because the expert did not

differentiate between legal and illegal pricing behavior.  Id.

Here, Vistnes does not define wage fixing to include legal activities.  Vistnes does not

suggest that any legitimate wage surveys facilitated a wage fixing agreement.  Although he

recognizes that information exchanges can in some situations increase competition, he testifies

and opines that the information exchanges in this case do no such thing.  Accordingly, his

opinion would be helpful to the jury.

### (3) Opinion not Related to the Facts of the Case because Vistnes failed to Examine Processes for Setting Nurse Compensation and did not Rely on Data Produced During Discovery

Defendants contend that Vistnes' opinions are unreliable because he failed to examine

the process by which Defendant Hospitals set their nurse compensation and failed to rely on any

data produced during discovery, such as payroll or human resource data.  They argue that "Dr.

Vistnes cannot reliably conclude that the information exchanges made it easier for Defendants

to coordinate if Dr. Vistnes himself did not understand how Defendants set nurse compensation -

and what role the information exchanges played in those decisions - in the first instance."

Defendants' Reply Memo. at 4.  Plaintiffs respond that "Vistnes does not analyze data to

determine whether the data [is] consistent with the existence of a conspiracy" because he "does

not opine on the existence of the conspiracy."  Plaintiffs' Opposition Memo. at 7.  They maintain

that Vistnes' opinion is supported by substantial economic literature and the record and does not

require information on how compensation was set.

"An expert's testimony is admissible under Rule 702 as long as the processes or techniques that he used to formulate his opinions are reliable."  Daubert, 509 U.S. at 594-95. In his report, Vistnes opines that:

> Information exchanges can facilitate coordination among rivals in two ways: they can provide a means by which rivals can monitor each other's conduct and ensure compliance with agreements to restrict competition; and they can provide rivals with a means by which they can more readily reach agreement.

He explains that "anticompetitive agreements among rivals are more likely to endure over time if firms have a means by which they can monitor each other's conduct to ensure compliance with the terms of the agreement."  According to Vistnes, "[i]nformation exchanges provide a mechanism to conduct such monitoring" because:

> rivals could monitor whether there is any cheating on an agreement to restrict competition for employees by sharing information about the wages they offer, the size of employees' annual salary increases, or the conditions under which employees qualify for overtime payments.  The more readily that firms can use an information exchange to identify when a rival has cheated on an anticompetitive agreement, and which rival(s) cheated, the greater the risk that rivals can use the information exchange to monitor and enforce an anticompetitive agreement to restrict competition. Information exchanges that increase rivals' ability to monitor each other's conduct can also reduce the expected costs associated with punishment; these reduced costs can, in turn, facilitate coordination by increasing the profitability of sustaining an anticompetitive agreement.

Additionally:

> Information exchanges that involve future terms of competition (e.g., prices or wages) can allow firms to communicate their plans for future prices or wages to their rivals and create a means by which rivals can communicate back how they will respond.  Thus, information exchanges involving future or planned terms of competition can provide a means by which rivals can reach agreement.

See Expert Report of Gregory S. Vistnes at 4.  In forming this opinions, Vistnes relied on economic theories published in various economic journals.  See e.g. Per Baltzar Overgaard and H. Peter Mollgaard, "Information Exchange, Market Transparency and Dynamic Oligopoly," in

Wayne Dale Collins (Ed.), *Issues in Competition Law and Policy,* American Bar Association (2008), at 1254; Michele Grillo, "Collusion and Facilitating Practices: A New Perspective in Antitrust Analysis," *European Journal of Law and Economics*, (September 2002) Vol. 14, N.2, pp. 151-169; Edward J. Green and Robert H. Porter, "Noncooperative Collusion under Imperfect Price Information," *Econometrica*, Vol. 52, No 1 (January 1984).

Armed with this background understanding, Vistnes then analyzed the communications between Defendant hospitals and determined, among other things, that: (1) "[a]ll Defendants shared information, and they did so frequently throughout the time period at issue"; (2) "Defendants shared information over a wide range of terms, thus allowing them to monitor a wide range of variables over which they might compete for RNs and expanding the scope of variables over which competition was softened;" (3) shared data without ensuring anonymity, thus allowing Defendants to monitor compliance; and (4) collected and shared information without the benefit or safeguards of a third party administrator. See Expert Report of Gregory S. Vistnes, Ph.D at 7.  Vistnes also opined from this analysis that he sees "no evidence suggesting that Defendant Hospitals' sharing of information regarding the terms by which they were competing, and planned to compete in the future, for RNs yielded any pro-competitive benefits that might offset the competitive harm associated with that information sharing."  Id. at 8.

Defendants do not take issue with the economic theories or the literature used by Vistnes as a basis for his opinions.  Similarly, they do not take issue with the communications which Vistnes analyzed.  Defendants do not dispute the validity of the communications or allege that Vistnes misunderstood the communications.  Instead Defendants take issue with the fact

that Vistnes failed to examine the process by which Plaintiff hospitals set their nurse compensation and, therefore, failed to test whether his economic theories applied in this case.

Vistnes' opinion is reliable pursuant to the standard articulated in <u>Daubert</u>, 509 U.S. 579 (1993) (In this inquiry, the district court should consider the indicia of reliability identified in Rule 702, namely, (1) that the testimony is grounded on sufficient facts or data; (2) that the testimony "is the product of reliable principles and methods"; and (3) that "the witness has applied the principles and methods reliably to the facts of the case."). Vistnes' lack of knowledge as to how the Defendant Hospitals set nurse compensation does not render his opinion unreliable because, following  a full examination of the information exchanges at issue in this case, his opinion is limited to: (1) an explanation of how information exchanges increase the ability to establish and maintain an agreement to reduce competition for RNs when certain variables and factors are present; and (2) his opinion that these variables were present in the information exchanges between Defendant Hospitals. Vistnes' facilitation opinion is supported by established economic theory and the undisputed facts surrounding the  information exchanges. Accordingly, Vistnes' facilitation opinion is admissible.

### b.  Whether Vistnes Relied on Ashenfelter's Opinion

Defendants allege that "Dr. Vistnes attempted to bridge [the] gap in his analysis by relying on the analysis and conclusions of Plaintiff's other expert, Professor Orley C. Ashenfelter" as part of his analysis "of balancing the costs and gains of any conspiracy among the Defendants." Defendants' Memo. at 12. Defendants contend that Ashenfelter's opinions are not a reliable basis for Vistnes conclusions and that Vistnes failed to "independently verify any of Ashenfelter's findings." <u>Id</u>. Because this Court has already found that Vistnes' conclusions are independently reliable, Defendants' argument is without merit.

2.    **Vistnes' Opinion that the Information Exchanges Softened Competition**

Defendants argue that Vistnes' softened competition opinion should be excluded because: (1) the conclusion is contradicted by the facts; and (2) he failed to link Defendants' information exchanges and any harmful effect on competition.

### a.  Whether Vistnes' Opinion is Contradicted by the Facts

Defendants do not challenge the factual or economic underpinnings of Vistnes' opinion.  Instead, Defendants allege that the facts necessary for any softening of competition as described by Vistnes are contradicted by the facts of the case; specifically that: (1) Defendants continued to raise compensation throughout the class period at different levels and rates; and (2) Defendants increased the number of nurses employed.

Vistnes softened competition opinion explains that:

> [a]n agreement to share information about future wages (or prices) can further magnify competitive problems associated with softening competition. If firms offer increased wages as a means of gaining a competitive advantage in labor markets, then providing advance notification to rivals about a firm's plans for future wages precludes that firm from using higher wages as a means of gaining an unanticipated competitive advantage over rivals.  Thus, just by sharing information about historical wages can soften competition by reducing the lag between when one rival raises wages and other rivals detect and can respond to those higher wages, sharing information about future wages can further reduce competition by completely eliminating any lag between when higher wages are offered and when rivals can detect and respond to those higher wages.

See Expert Report of Gregory S. Vistnes, Ph. D, June 22, 2009 at 6-7.

Therefore, Vistnes' opinion is not contradicted by the fact that hospitals continued to raise compensation and hire workers.  Vistnes' opinion on its face does not require that all differences between hospitals be eliminated, the opinion merely states that competition will be reduced, raises will occur less often, and raises will be for smaller amounts.  See Reply Report

of Gregory S. Vistnes, Ph.D, December 4, 2009, at page 70 ("In a world with differentiation, however, there is no clear basis on which to assume that hospitals should all be paying their nurses the same amount, or that hospitals should be increasing wages by the same amount. Rather what is important is whether the information exchange led hospitals to offer lower wages than they otherwise would, and this outcome can occur even if hospitals do not eliminate all wage differentials.").   Therefore, Defendants criticisms are an insufficient basis to warrant precluding the testimony.

### b. Whether Vistnes' Opinion Linked Information Exchanges to any Harm or Causation

Secondly, Defendants allege that Plaintiffs failed to link the information exchanges to any harm or causation.  Specifically, they point out that Vistnes did not trace the timing and content of the information exchanges to the timing and content of Defendants' nurse compensation setting decisions.

Plaintiffs contend that "Dr. Vistnes' opinion that the information exchanges softened competition is based on a careful study of the details of those exchanges and the principles found in the economics literature regarding the competitive effect of information exchanges." Plaintiffs' Opposition Memo. at 14-15.   They claim that, therefore, "[t]here is a solid basis from which to conclude that the particular exchanges under the particular circumstances of this case reduced Defendants' incentive to increase wages to gain a competitive advantage" which in and of itself is a reduction in competition.  Plaintiffs' Opposition Memo. at 15.

In McCullock v. H.B. Fuller Co., 61 F.3d 1038, 1044 (2d Cir. 1995), the Second Circuit held that "[d]isputes as to . . . faults in [expert's] use of [particular scientific analysis] as a methodology . . . go to the weight, not the admissibility, of his testimony."  Here, Defendants do

not dispute the economic literature on which Vistnes bases his opinion, they only dispute that

he fails to compare the timing of the exchanges to the changes in compensation.  Defendants

will have the opportunity to cross-examine Vistnes at trial as to his decision not to apply his

conclusions to the timing of exchanges and compensation decisions, and the jury will be able

to assign the appropriate weight to the expert's opinions.    Furthermore, Vistnes' theory of

softened competition purportedly does not lend itself to the sort of "tracing" promulgated by the

Defendants.   Individual information exchanges cannot be linked to particular compensation

decisions because Vistnes' theory describes a cumulative effect on competition resulting from

the timing, scope and nature of the information exchanges.

Accordingly, Vistnes opinions are admissible.

### c.    Defendants Ellis and Albany Medical Center's Joint Motion for Summary Judgment

Defendants move for summary judgment as to Counts I and II of Plaintiffs' Complaint.

Count I alleges that Defendants engaged in a continuing conspiracy to depress wages of RNs

employed by Defendants in violation of Section 1 of Sherman Antitrust Act.  Count II alleges that

Defendants engaged in a continuing agreement to regularly exchange detailed and nonpublic

information about the compensation being paid or to be paid to their RN employees in violation

of Section 1 of the Sherman Antitrust Act.

Defendants maintain they are entitled to summary judgment as to: (1) Count I because

there is no direct evidence of a compensation fixing conspiracy or evidence of parallel movement

of Defendants' wages; and (2) Count II because Plaintiffs cannot establish market definition or

causation.  Additionally, Defendants maintain they are entitled to summary judgment as to both

Counts because Plaintiffs cannot show harm to competition, injury in fact, or causation.  Plaintiffs oppose the motion.

Section 1 of the Sherman Antitrust Act states, "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is hereby declared to be illegal." 15 U.S.C. § 1.  Specifically, this provision prohibits "only unreasonable restraints of trade." Business Elecs. Corp. v. Sharp Elecs. Corp., 485 U.S. 717 (1988).  "To establish a § 1 violation, a plaintiff must produce evidence sufficient to show: (1) a combination or some form of concerted action between at least two legally distinct economic entities; and (2) such combination or conduct constituted an unreasonable restraint of trade either per se or under the rule of reason. Top Markets, Inc. v. Quality Markets, Inc., 142 F.3d 90, 95-96 (2d Cir. 1998); see Capital Imaging Associated, P.C. v. Mohawk Valley Medical Associates, Inc., 996 F.2d 537, 542 (2d Cir. 1993).  In determining whether certain concerted action amounts to an unreasonable restraint, the action "is either analyzed (1) through the per se standard, which presumes that the questionable conduct has anticompetitive effects without comprehensive inquiry into whether the concerted actions produced adverse anticompetitive effects, or (2) through the so called rule of reason, a case- by- case method that involves consideration of all of the circumstances of a case to decide whether certain concerted action should be prohibited because it amounts to an anti-competitive practice." In re Baby Food Antitrust Litigation, 166 F.3d 112, 117-118 (3d Cir. 1999).

"To survive [Defendants'] motion for summary judgment, [Plaintiffs] must establish that there is a genuine issue of material fact as to whether [Defendants] entered into an illegal conspiracy that caused [Plaintiffs] to suffer a cognizable injury." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 585-586 (1986). This showing has two components:

(1) "[Plaintiffs] must show more than a conspiracy in violation of the antitrust laws; they must show an injury to them resulting from the illegal conduct;" and (2) "the issue of fact must be genuine." Id. Plaintiffs "must come forward with 'specific facts showing that there is a genuine issue for trial.'" Id.

### 1.    Count I - Per Se Claim

Defendants allege that they are entitled to summary judgment as to Count 1 because Plaintiffs cannot show an agreement to fix wages. Plaintiffs contend that they have "extensive evidence meeting the Matsushita standard for circumstantial proof of a per se claim." See Plaintiffs' Opposition Memo. at 9.

"Generally, price-fixing [or in this case wage-fixing] agreements are considered a per se violation of the Sherman Act." In re Baby Food, 166 F.3d at 118 (citing United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 218 (1940)). "Per se violations include those types of restraints on competition that are in and of themselves considered unreasonable because 'their pernicious effect on competition and lack of any redeeming virtue are conclusively presumed to be unreasonable.'" Id. (quoting United States v. Cargo Service Stations, Inc., 657 F.2d 676, 682 n. 4 (5th Cir. Unit B 1981)); see Northern Pacific Railway Co. v. United States, 356 U.S. 1, 5 (1958). "Although the Sherman Act's language is arguably broad enough to include a 'purely tacit agreement to fix prices,' most courts agree 'that an express, manifested agreement, and thus an agreement involving actual verbalized communication, must be proved in order for a price-fixing conspiracy to be actionable under the Sherman Act.'" In re Ethylene Propylene Diene Monomer (EPDM) Antitrust Litigation, 681 F. Supp.2d 141, 165 (D. Conn. 2009) (citing In re High Fructose Corn Syrup Antitrust Litigation, 295 F.3d 651, 654 (7th Cir. 2002)). "To prove the existence of an express, manifested agreement, the antitrust plaintiff should present 'direct

or circumstantial evidence that reasonably tends to prove that the manufacturer and others had a conscious commitment to a common scheme designed to achieve an unlawful objective.'" Id. (citing Monsanto Co. v. Spray-Rite Serv. Corp., 465 U.S. 752, 764 (1984) (internal quotation omitted)); see also Apex Oil Co. v. DiMauro, 822 F.2d 246, 252 (2d Cir. 1987) (holding that, "at a minimum," a jury must be able to conclude that "conspirators had a unity of purpose or a common design and understanding, or a meeting of minds in an unlawful arrangement" (quotation omitted)).  Antitrust law, however, "limits the range of permissible inferences from ambiguous evidence in a § 1 case."  Matsushita, 475 U.S. at 588.  "Thus in Monsanto Co. v. Stray-Rite Service Corp., 465 U.S. 752, 764 (1984), [the Supreme Court] held that conduct as consistent with permissible competition as with illegal conspiracy does not, standing along, support an inference of antitrust conspiracy."  Id.  Therefore, "a plaintiff seeking damages for a violation of § 1 must present evidence 'that tends to exclude the possibility' that the alleged conspirators acted independently."  Id. (citing Monsanto Co., 465 U.S. at 764).

Defendants contend that Plaintiffs do not have any direct evidence of an agreement to depress nurse pay and contend that "in order to rely on circumstantial evidence to prove a Section 1 conspiracy claim [Plaintiffs] 'must first demonstrate that the defendants' actions were parallel.'"  See Defendants' Memo. at 17-18 (quoting In re Beef Indus. Antitrust Litig., 907 F.2d 510, 514 (5th Cir. 1990)).  Here, Plaintiffs do not purport to have direct evidence of a conspiracy, but instead argue they have extensive circumstantial proof of a per se claim.

As a preliminary matter, Plaintiffs contend that they do not have to prove parallel conduct.  The Supreme Court has made clear that under Section 1 of the Sherman Act "'the crucial question' is whether the challenged anticompetitive conduct 'stem[s] from independent decision or from an agreement, tacit or express.'"  Bell Atlantic Corp. v. Trombly, 550 U.S. 544,

553 (2007) (quoting Theatre Enterprises, Inc. v. Paramount Firm Distributing Corp., 346 U.S. 537, 540 (1954)). "While a showing of parallel 'business behavior is admissible circumstantial evidence from which the fact finder may infer agreement,' it falls short of 'conclusively establishing agreement or . . . itself constituting a Sherman Act offense.'" Id. (quoting Theatre Enterprises, 346 U.S. at 540-541). Defendants cite to In re Beef Indus. Antitrust Litig., 907 F.2d 510, 514 (1993), for the proposition that Plaintiffs must demonstrate that the defendants' actions were parallel to prove a Section 1 conspiracy claim. In this case, the Fifth Circuit held only that "[w]hen an antitrust plaintiff relies on circumstantial evidence of conscious parallelism to prove a § 1 claim, he must first demonstrate that the defendant's actions were parallel." Defendants cite to no case law that stands for the requirement that, to prevail, Plaintiffs must prove parallel pricing if they are not relying on conscious parallelism. Parallel pricing is merely "one such form of circumstantial evidence." In re Ethylene, 681 F. Supp.2d at 166. Accordingly, Plaintiffs need not prove parallel pricing in order to prevail on per-se claim based on circumstantial evidence. The issue, therefore, becomes whether Plaintiffs have alleged sufficient evidence to meet the Matsushita standard for circumstantial proof of a per se claim.

In Matsushita, 475 U.S. at 593-98, the Supreme Court held that a conspiracy case based on circumstantial evidence must be economically plausible and must exclude the possibility that the alleged conspirators acted independently.

### a.  Whether economically plausible

A conspiracy may be economically plausible if the defendants had a motive to engage in the conspiracy. In Matsushita, 475 U.S. at 592, the Court found that defendants had no motive to engage in a predatory pricing scheme absent some strong likelihood that the alleged conspiracy would eventually pay off. Because the Court did not find evidence that any alleged

predatory pricing scheme was successful "petitioners had every incentive not to engage in the conduct with which they are charged, for its likely effect would be to generate losses . . . with no corresponding gains."  Id. at 595.  The Court held:

> [t]hat being the case, the absence of any plausible motive to engage in the conduct charged is highly relevant to whether a 'genuine issue for trial' exists . . . Lack of motive bears on the range of permissible conclusions that might be drawn from ambiguous evidence: if petitioners had no rational economic motive to conspire, and if their conduct is consistent with other, equally plausible explanations, the conduct does not give rise to an inference of conspiracy.

Matsushita, 475 U.S. at 596-97.

Courts have also found circumstantial evidence of an agreement through evidence of parallel pricing coupled with other "'plus factors' tending to establish that the defendants were not engaging merely in oligopolistic price maintenance or price leadership but rather in a collusive agreement to fix prices or otherwise restrain trade."  City of Tuscaloosa v. Harcos Chemicals, Inc., 158 F.3d 548, 570 (11th Cir. 1998) (citing to Dunnivant v. Bi-State Auto Parts, 851 F.2d 1575, 1583 (11th Cir. 1988); Gainsville Util. Dep't v. Fla. Power & Light Co., 573 F.2d 292, 300-02 (5th Cir. 1978)); see In re Ethylene Propylene Diene Monomer Antitrust Litigation, 681 (D. Conn. 2009) ("[T]herefore, in addition to submitting evidence of parallel price increases, the plaintiffs must establish certain so-called 'plus' factors, 'which when viewed in conjunction with the parallel acts, can serve to allow a fact finder to infer a conspiracy.'") (quoting Apex Oil Co. v. DiMauro, 822 F.2d 246 (2d Cir. 1987)).

The Court has already held that evidence of parallel pricing is not a prerequisite to a finding of an agreement based on circumstantial evidence.  Plaintiffs argue that in a case involving wage fixing, as opposed to price fixing, parallel pricing would be unexpected because the factors in employment decisions permit a conspiracy to operate without highly coordinated

prices changes.  A conspiracy to depress wages can continue to exist despite slight temporary differences in pay scales because these differences will not result in large scale employee movement.  This is so because the costs associated with changing jobs may outweigh slight differences in pay.  Secondly, Plaintiffs allege the conspiracy to depress wages is accomplished, not by coordinating wages, but instead, through the economic theory of softened competition. This theory posits that because the hospitals knew that any increase they made in wages would be known to the other hospitals, there was no incentive to increase wages so as to be more competitive than the others.

The "plus factors," however, are relevant to the determination of whether circumstantial evidence points to a conspiracy. Such "plus factors" include: (1) a motive to conspire, which can be evidence that the industry is susceptible to price-fixing; (2) noncompetitive behavior, i.e., evidence that the defendants acted contrary to their economic self interest; and (3) evidence of a traditional conspiracy, such as a high level of inter-firm communications that would suggest that the defendants consciously agreed not to compete.  In re Ethylene, 681 F. Supp.2d at 166 (citing to Apex Oil, 822 F.2d at 253; In re Flat Glass Antitrust Litig., 385 F.3d 350, 360 (3d Cir. 2004)).

Plaintiffs allege they have "strong circumstantial proof of the existence of the conspiracy. This proof includes the fact that: (1) Defendants' actions would be contrary to their economic interest if no conspiracy existed; (2) the structural characteristics of the market show that Plaintiff's allegations make economic sense; (3) the high degree of cooperation among Defendants created relationships conducive to reaching and maintaining a wage agreement; and (4) Defendants exchanged current prices.

### (1)  Contrary to Economic Interest

First, Plaintiffs argue that the information exchanges would be contrary to the Defendant's economic interest if no conspiracy existed.  They argue that: (1) "no hospital, facing a shortage of nurses, would directly disclose its pay structure to a competitor absent an agreement among those hospitals that the recipient will not use the information as a genuine competitor would do - to bid away nurses;" (2) "it is equally contrary to a hospital's independent self interest to operate short of critical staff without using the information it obtains from rivals to try and fill its vacancies from lower paying hospitals in the area;" and (3) "it makes no sense to freely give valuable market intelligence gained from one rival to another rather that use it to one's own advantage."  See Plaintiffs' Opposition Memo. at 9-12.

### (2)  Structure of the Market shows agreement makes economic sense

Second, Plaintiffs contend that the "structural characteristics of this market show that Plaintiffs' allegations made economic sense."  See Plaintiffs' Opposition Memo. at 13.  They point to factors in the market such as: (1) the high cost of switching jobs; (2) the frequency of information exchanges; and (3) the potential for enormous gains because nurses represent the "largest single cost for the hospitals."  See Plaintiffs' Opposition Memo. at 13-14.

### (3)  High Degree of Cooperation

Third, Plaintiffs allege that circumstantial evidence is particularly shown by the Defendants' continual and pervasive direct hospital-to-hospital exchanges of proprietary information about the amount they pay their nurses in the face of endemic shortages of nurses. In In re Ethylene, 681 F. Supp.2d at 173 the court explained:

> [w]ithout doubt, the key plus factor at summary judgment is the plaintiffs' evidence of an actual manifest agreement, i.e., evidence that includes 'customary indications of

traditional conspiracy,' or 'proof that the defendants got together and exchanged assurances of common action or otherwise adopted a common plan even though no meetings, conversations, or exchanged documents are shown.'  The plaintiffs have submitted documents memorializing meetings and discussions about prices and capacity issues they contend give rise to an inference of illegal collusion. Those documents indicate that the defendants were extremely chummy and treated each other more like colleagues than traditional competitors, and that the defendants' executives often communicated immediately before or after a . . . price increase.

The court held that "the plaintiffs' evidence of the frequent and friendly communications between the defendants and the secrecy of their meetings [was] sufficient to allow a reasonable jury to infer that the defendants participated in an unlawful price-fixing conspiracy."

In this case, Defendant Hospitals exchanged wage information "through numerous e-mails, telephone calls, and in-person conversations at job fairs and professional association meetings." Plaintiffs' Opposition Memo. at 2; see Plaintiff's Response to Defendants' Statement of Undisputed Facts at paragraphs 8, 18, 23, 25, 49, 71, 72, 97, 103, 106, 130, 137.  These communications discussed, among other things, staff RN pay ranges, RN new graduate rates, and shift differentials. Id.  Plaintiffs maintain that "Defendants typically collected this information prior to budgeting and implementing RN pay adjustments."  Id.  Most significantly, these information exchanges contained current and future RN compensation information. Id.; see Todd v. Exxon Corp., 275 F.3d 191, 211 (2d Cir. 2001) ("The Supreme Court has made clear that '[e]xchanges of current price information, of course, have the greatest potential for generating anti-competitive effects and although not per se unlawful have consistently been held to violate the Sherman Act.'" (quoting Gypsum, 438 U.S. at 441 n. 16)).

Plaintiffs also argue that certain features of the information exchanges make it impossible for Defendants to yield pro-competitive results.  These include: (1) the information exchange occurred "in the face of an acknowledged local shortage of nurses;" (2) "the

information exchange is not public, that is, not shared with participants on both sides of the market;" and (3) "the information is shared directly with competitors, not through third parties who protect the anonymity of the shared data."  Plaintiffs' Opposition Memo. at 11-12.

Considering the circumstantial evidence as a whole and construing it in the light most favorable to Plaintiff's, a reasonable jury could conclude that Defendants were engaged in collusive behavior.

### b.  Whether the Evidence Excludes the Possibility that the Alleged Conspirators Acted Independently

"Establishing an antitrust case on the basis of circumstantial evidence necessarily means that the evidence . . . is susceptible to differing inferences - the inference that, on the one hand, the defendants were engaged in illegally collusive behavior or that, on the other hand, they were merely engaged in lawful, independent [wage setting]."  In re Ethylene, 681 F. Supp.2d at 167.  Therefore, pursuant to Monsanto, 465 U.S. at 764, and Matsushita, 475 U.S at 1356, Plaintiffs "must present evidence that 'tends to exclude the possibility' that the alleged conspirators acted independently."  "Important facts to evaluate in this analysis include: (1) whether the Defendants' actions, if taken independently, would be contrary to their economic self-interest; (2) whether the defendants have been uniform in their actions; and (3) whether the defendants have exchanged or have had the opportunity to exchange information relative to the alleged conspiracy; and (4) whether the defendants have a common motive to conspire." Re/Max Intern., Inc. v. Realty One, Inc., 173 F.3d 995, 1009 (6th Cir. 1999); see Wallace v. Bank of Bartlett, 55 F.3d 1166, 1168 (6th Cir. 1995).  "Ordinarily, an affirmative answer to the first of these factors will consistently tend to exclude the likelihood of independent conduct."  Id.

Here, Plaintiffs argue that if Defendants set compensation independently, their actions would have been contrary to their economic self interest.  They maintain that during a nursing shortage it would be against Defendants' best interests to exchange wage information because, absent an agreement, rivals would use the information to "poach" nurses and compete against each other.  A rival would not be likely to exchange current and future wage information without entering into a prior agreement protecting it from competitors.  The fact that but-for a wage agreement, Defendants would be acting against economic self interest is persuasive evidence that Defendants did not act independently.  Accordingly, Plaintiffs have provided sufficient evidence of an agreement to with withstand summary judgment as to Count I.

### 2.    Count 2 - Rule of Reason Claim

Defendants contend they are entitled to summary judgment as to Count II because Plaintiffs cannot show that Defendants' information exchanges harmed competition.  Count II of Plaintiffs' Complaint alleges that "defendants and their co-conspirators have engaged in a continuing agreement to regularly exchange detailed and non-public information about the compensation being paid or to be paid to their RN employees" and that "[t]his agreement is an unreasonable restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. §1."  In United States v. Citizens & Southern National Bank, 422 U.S. 86, 113 (1975), the Supreme Court held that "the dissemination of price information is not itself a per se violation of the Sherman Act."  "Where the violation lies in the information exchange itself - as opposed to merely using the information exchange as evidence upon which to infer a price-fixing agreement . . . [the] exchange can be found unlawful under a rule of reason analysis." Todd v. Exxon Corp., 275 F.3d 191, 198 (2d Cir. 2001); see Battipaglia v. N.Y. State Liquor Auth., 745 F.2d 166, 174-75 (2d Cir. 1984).  Under the rule of reason analysis, the "test of legality is whether the restraint

imposed is such as merely regulates and perhaps thereby promotes competition or whether it is such as may suppress or even destroy competition." F.T.C. v. Indiana Federation of Dentists, 476 U.S. 447, 458 (2009) (quoting Chicago Board of Trade v. United States, 246 U.S. 231, 238 (1918)).  "Before a factfinder may consider the harms and benefits of the challenged behavior, a plaintiff initially must show that 'the challenged action had an *actual* adverse effect on competition as a whole in the relevant market; to prove it has been harmed as an individual competitor will not suffice.'"  Top Markets, Inc., 142 F.3d at 96 (quoting Capital Imaging, 996 F.2d at 543 (emphasis in original)).  To satisfy this burden, Plaintiff must either: (1) show an actual adverse effect on competition; or (2) establish that Defendants had sufficient market power to cause an adverse effect on competition.  See Top Markets, Inc., 142 F.3d at 96; see K.M.B. Warehouse Distributors, Inc. v. Walker Mfg. Co., 61 F.3d 123, 128-129 (2d Cir. 1995); Capital Imaging, 996 F.2d at 546 ("The plaintiffs may satisfy this burden without detailed market analysis by offering proof of actual detrimental effects, such as reduction of output.  Yet, where the plaintiff is unable to demonstrate actual effects, it must at least establish that defendants possess the requisite market power so that their arrangement has the potential for genuine adverse effects on competition.")(internal citation omitted).  "If plaintiff satisfies this burden, the burden then shifts to defendant to offer evidence that its conduct had pro-competitive effects." Arkansas Carpenters Health and Welfare Fund v. Bayer AG, 604 F.3d 98, 104 (2d Cir. 2010). "If defendant is able to offer such proof, the burden shifts back to plaintiff, who must prove that any legitimate competitive effects could have been achieved through less restrictive alternatives."  Id.

Here Defendants argue that Plaintiffs cannot establish "a relevant market" or "that Defendants' information exchanges actually caused any anticompetitive suppression of nurse compensation."  See Defendants' Memo. at 23.

### a.  Actual Adverse Effect on Competition

"In order to fulfill this requirement, the plaintiff must show more than just that he was harmed by defendants' conduct."  K.M.B. Warehouse, 61 F.3d at 127; see Borger v. Yamaha Int'l Corp., 625 F.2d 390, 397 (2d Cir. 1980).  "The overarching standard is whether defendants' actions 'diminish overall competition, and hence consumer welfare.'"  Id. (quoting Graphic Prods. Distribs. v. Itek Corp., 717 F.2d 1560, 1571, 1573 (11th Cir. 1983).  An actual adverse effect can be shown "by examining factors like reduced output, increased prices and decreased quality."  Virgin Atlantic Airways Ltd. v. British Airways PLC, 257 F.3d 256, 264 (2d Cir. 2001).

In this case, Plaintiffs argue that they "have presented evidence of adverse effects on competition arising from Defendants' agreement to trade nurse compensation data" by producing "both evidence that the Albany hospital nurse market is characterized by significant and persistent shortage of nurses . . . and evidence of depressed wages."  Plaintiffs' Opposition Memo. at 19.  Plaintiffs have introduced the expert testimony of Prof. Ashenfelter who employs economic methodology to show that RN wages were depressed during the class period and that nurses were underutilized in the Albany area.  Ashenfelter compared the actual wages paid to staff nurses in the Defendant hospitals with actual wages paid to agency nurses to determine how much staff nurses should have been paid.  He also used actual employment data in the Albany area and nationwide when determining utilization rates. This evidence, if believed, shows an actual adverse effect on all RNs in the defendants hospitals; that their wages were depressed and that hospitals were underutilizing staff nurses.  C.f. Top Markets, Inc., 142 F.3d at 96

(unable to satisfy burden because "failed to demonstrate an actual detrimental effect on competition" because " [i]t relied almost entirely on the [an affidavit], which discussed potentially higher prices but failed to allege prices were actually higher, failed to provide proof that the plaintiff's exclusion from the market had resulting in any decrease in quality of service to area shoppers, and failed to allege that other supermarkets were excluded from the market."); Virgin Atlantic Airways Ltd. v. British Airways PLC, 257 F.3d 256, 264 (unable to satisfy burden because plaintiff does not provide any hard data to support their expert's calculations and expert testimony rooted in hypothetical assumptions cannot substitute for actual market data"). Plaintiffs have likewise offered the expert testimony of Prof. Vistnes to explain the mechanism by which information exchanges lead to suppressed wages through the economic theory of softened competition.  Evidence of suppressed wages and underutilization in conjunction with an explanation of how these information exchanges can lead to softened competition is sufficient to satisfy Plaintiffs' burden on summary judgment.  Because Plaintiff' have demonstrated actual adverse effects they do not have to make a showing of sufficient market power.  See Capital Imaging, 996 F.2d at 546 ("The plaintiffs may satisfy this burden without detailed market analysis by offering proof of actual detrimental effects, such as reduction of output.").  Accordingly, Plaintiffs have provided sufficient evidence of anticompetitive effect to with withstand summary judgment as to Count II.

### 3.   Whether Plaintiffs have Evidence to Prove Harm to Competition or Injury-in-Fact

Defendants contend they are entitled to summary judgment because Plaintiffs have failed to provide evidence of harm to competition or injury in fact.  They allege that because Ashenfelter's benchmark methodology and analysis is speculative and lacks factual support it

fails to prove anticompetitive effects and injury to the class.  Defendants reargue the same points made in their joint motion to exclude the expert testimony Orley Ashenfelter.  For the reasons stated previously in this opinion, the methodology is admissible for proving harm to competition and injury in fact.   Accordingly, Plaintiffs have provided sufficient evidence of harm to competition or injury in fact to withstand summary judgment.

### 4.   Whether Plaintiffs have Evidence to Prove Causation

Defendants argue that Plaintiffs cannot prove the alleged anti-trust injury was caused by Defendants' alleged violation of the antitrust laws.  They allege that the only way causation can be shown is to "'conduct an empirical inquiry into the effect of the information exchange on compensation decisions and resulting compensation outcomes' which 'requires a close examination of the scope, nature, and timing, of information exchanges juxtaposed against outcomes captured by actual compensation data.'" Defendants' Mem. at 33 (quoting Willig Report paragraph 76).  Defendants submit that their own expert, Prof. Willig, "reviewed the information exchanges in painstaking detail - exchange by exchange - and evaluated their effects on Defendants' actual compensation decisions" finding no "systemic or causal link between RN compensation and the information exchanges." Id. at 35.  Accordingly, Defendants contend that "Plaintiffs present[ed] no evidence that, in the absence of the direct information exchanges" would nurses have made more money.  Id.

"The requirement that an antitrust plaintiff demonstrate that the alleged illegal acts were the cause of its damages is well established." Sound Ship Bldg. Corp. v. Bethlehem Steel Co. (Inc.), 533 F.2d 96, 98 (1976);  See Zenith Radio Corp. v. Hazeltine Research Inc., 395 U.S. 100, 114 n.9 (1969).  This can be satisfied by setting forth "a theory or . . . set of facts in the

depositions and other documents . . . [to] show a causal link." See Sound Ship Bldg., 533 F.2d at 98.

In this case Plaintiffs have set forth a theory of causation supported by expert testimony and economic theory.  Plaintiffs' expert, Prof. Vistnes, is offered to explain how the theory of softening of competition and how information exchanges of current information can lead to depressed wages.  Plaintiffs also offer the testimony of Ashenfelter to provide evidence that the wages were indeed suppressed.  Plaintiffs argue that Dr. Vistnes' analysis does not allow for "evidence linking specific exchange of pay data to some specific pay decision, because that is not how the theory of softening competition works."

For purposes of summary judgment, the Court finds Plaintiffs' theory persuasive for inferring causation.  Accordingly, Plaintiffs' evidence is sufficient to withstand Defendants' joint motion for summary judgment.


**d.    Plaintiff's Motion to Exclude Portions of Expert Testimony of Robert Willig**

Robert Willig is Defendants' expert witness retained to: (1) "assess the collusion and information exchange claims and their alleged effect on the compensation of members of the class"; (2) "opine on whether conditions in the Albany area have been conducive to the alleged coordination and conspiracy;" and (3) "to examine and respond to the analysis and opinion on these issues set forth by Plaintiffs' experts."  See Defendants' Opposition Memo. at 1.

Plaintiffs argue that "the Court should prohibit Prof. Willig from offering any opinion in this case concerning: (1) [w]hether the fact discovery record in this case is probative or not of the alleged conspiracy; and (2) [t]he information the Defendants did or did not consider in making their compensation decisions, and the effect or lack of effect particular information had

on such decisions." See Plaintiffs' Memo. at 6-7. Plaintiffs argue these opinions "supplant the role of the jury" because "[t]he jury is fully capable of reading the same lay documents and lay deposition testimony as Prof. Willig and deciding whether they contain evidence of the conspiracy and what they show about the basis of Defendants' compensation decisions." Id. at 1. Accordingly, Plaintiffs contend that "Willig's interpretation of the meaning and significance of such documents and deposition testimony on pure factual questions is inadmissible under the Federal Rules of Evidence." Id. Defendants oppose this motion arguing that "Prof. Willig's testimony satisfies the requirements for admissibility of expert testimony under Fed. Rule of Evidence 702." See Defendants' Opposition Memo. at 1.

Fed. R. Evidence 702 provides that "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert . . . may testify thereto." "For an expert's testimony to be admissible under this Rule, however, it must be directed to matters within the witness' scientific, technical, or specialized knowledge and not to lay matters which a jury is capable of understanding and deciding without the expert's help." Andrews v. Metro North Commuter R. Co., 882 F.2d 705, 708 (1989); see McGowan v. Cooper Indus., Inc., 863 F.2d 1266, 1272 (6th Cir. 1988); Scott v. Sears, Roebuck & Co., 789 F.2d 1052, 1055-56 (4th Cir. 1986); United States v. Binder, 769 F.2d 565, 602 (9th Cir. 1985); Strong v. E.I. DuPont de Nemours Co., 667 F.2d 682, 685-86 (8th Cir. 1981). Furthermore, the testimony must "assist the trier of fact." Nimely v. City of New York, 414 F.3d 381, 397 (2d Cir. 2005). "Expert testimony that 'usurp[s] either the role of the trial judge in instructing the jury as to the applicable law or the role of the jury in applying that law to the facts before it,' by definition does not 'aid the jury in making a decision'; rather, it 'undertakes to tell the jury what result to reach,' and this 'attempts to substitute the

expert's judgment for the jury's.'" Nimely, 414 F.3d at 397 (quoting Bilzerian, 926 F.2d at 1294;

United States v. Duncan, 42 F.3d 97, 101 (2d Cir. 1994)).

> ### 1.    Whether Willig can Testify as to the Absence of Conspiracy Evidence

Plaintiffs' argue that Willig makes overly broad statements concerning the absence of

conspiracy evidence.[5]  They argue that these statements "offer *factual* conclusions based *solely*

on [Willig's] *lay* understanding of *fact* evidence" and are, thus, inadmissible.  Plaintiffs' Reply

Memo. at 1.  Defendants counter that experts are entitled to offer testimony that "embraces an

ultimate issue to be decided by the trier of fact."  Fed. R. Evid. 704 (a); see United States v.

Bilzerian, 926 F.2d 1285, 1294 (2d Cir. 1991) (an expert witness may "opine on an issue of fact

within the jury's province" and "factual conclusions may be included in an expert's testimony" as

long as the expert does not state "ultimate legal conclusions based on those facts.").

Defendants contend that Willig's testimony "was informed by economic principles . .

. regarding the importance of 'focal points', the economic incentives for hospitals to cheat on an

alleged agreement to suppress RN wages, and the factors that make monitoring and enforcing

such an agreement more difficult in this market."   Defendants' Opposition Memo. at 6.

Therefore, they contend, Willig is not "offering his lay understanding of purely factual evidence,

but interpreting that evidence in light of economic principles with which the average juror will be

unfamiliar."  Id.

---

[5] The specific statements to which Plaintiffs object are: (1) "I have seen *no evidence* suggesting that such an agreement [to suppress nurse wages] existed;" (2) "there is no evidence to indicate that non-base wages, much less base wages, were the focal point of any alleged conspiracy;" (3) "[a]fter reviewing these information exchange documents, I have not found any evidence that suggests the presence of an agreement to fix wages or any evidence that rivals punished deviators that implemented significant rate increases of the type shown by AMC and NEH;" and (4) "[t]here is no evidence that a conspiracy was particularly directed at nurses in speciality departments."  Plaintiffs' Memo. at 2.

In this case, Prof. Willig is not, as Plaintiffs suggest, merely looking at the evidence and determining that he does not think the evidence indicates the existence of a conspiracy. Instead, he is looking at the evidence and interpreting the likelihood of a conspiracy based on certain well accepted economic factors. "Economic literature recognizes three elements required for collusion to have sustained impact on a market: the parties to the alleged agreement must be able to '(1) reach consensus on the terms or focal point of an agreement, (2) detect cheating on the agreement, and (3) push deviations from the agreement.'" Defendants' Opposition Memo. at 7 (quoting Expert Report of Robert D. Willig at paragraph 9). Based on these elements Willig opines that : (1) "without 'focal point corresponding to the actual terms of the alleged agreement, a Defendants could not know how to comply with the alleged conspiracy, monitor adherence to it by its rivals, or effectively enforce it;'" and (2) "'[m]arket conditions and the characteristics of the . . . services offered' affect the likelihood that collusion will lead to anticompetitive outcomes." Id. (quoting Expert Report of Robert D. Willig at paragraphs 11 and 9). He further opines that the type of agreement suggested by the Plaintiffs is unlikely based on the economic state of the market and the way in which the information exchanges took place. These opinions are informed by his background knowledge in economics and his ability to apply the facts to this information. A juror would not have this expertise or the ability to apply the factual information to Willig's background knowledge. Accordingly, his opinions maybe helpful to the jury and are admissible.

### 2. Whether Willig can Testify as to the Information Defendants Considered in Making their Compensation Decisions, and the Effect of that Information on their Decisions

Plaintiffs argue that Willig's opinions regarding statements about Defendants' use of each other's compensation information are "outside the scope of his expertise, and invade[] the

jury's province" because they are factual conclusions based on "nothing more than his reading of the factual record."[6]   Plaintiffs' Memo. at 3.   They contend that "Prof. Willig has absolutely no economic principle or method of analysis for divining what factored into Defendants' compensation decisions."   Id.

According to Defendants, Willig conducted an "economic analysis of whether there [was] a causal link between the levels and changes in RN compensation and the [] information exchanges."   Defendants' Opposition Memo. at 10.   In order to complete this analysis, Willig examined the "scope, nature, and timing of information exchange juxtaposed against outcomes captured by actual compensation data."   Id.   He determined that evidence was lacking to prove a causal connection.   Defendants contend that the proposed testimony "will help the jury by

---

[6]   The specific statements to which Defendants object include: (1) "The evidence supports the position that the information received by Ellis from other hospitals did not form the basis of compensation decisions or negotiation strategies.   Nor does it appear to have had an incremental impact on such decisions to the detriment of Ellis nurses;" (2) "Based on these facts, it seems likely that knowledge gained from this informal salary survey led to wage changes [at Ellis] that were higher than would otherwise have been negotiated;" (3) "Dr. Vistnes has not shown, and I have not found, instances where these information exchanges led to Ellis negotiating wages with the NYSNA below that which would have existed but for these exchanges;" (4) "The information received by St. Peter's was not the basis of compensation decisions, although St. Peter's considered certain information received. Nor does the information disclosed in these exchanges indicate that it had an incremental impact on compensation decisions that inured to the detriment of St. Peter's RNs;" (5) "There is no evidence or testimony indicating that St. Peter's used this information to modify its own shift differential practices in a manner that would have made its nurses worse off than without the information received by St. Peter's;" (6) "The information received by Seton was not the basis of compensation decisions, although Seton considered certain information from these exchanges.   I find no evidence to suggest that the information subject to these exchanges had an incremental impact on compensation decisions that inured to the detriment of Seton RNs;" (7) "The information obtained from other hospitals appears to have contributed to Seton's decision to increase RN wages to remain market competitive;" (8) "Dr. Vistnes has not shown, and I have not found, instances where Seton set RN compensation at levels below that which would have existed but for these information exchanges;" and (9) "The information received by NEH does not appear to have been the basis for any compensation decision other than determining that its wages were not at competitive levels and required significant increases.   I find no evidence to suggest that the information shared through these exchanges had an incremental impact on compensation decisions which made NEH's RNs worse off than they would have been but for these information exchanges."   Plaintiffs' Memo. at 3-4.

showing them there is no connection between the alleged conduct and actual compensation decisions." Id. at 11.

In addition to testifying regarding these findings, Defendants also seek to allow Willig to "opine at trial regarding both Defendants' [use of information exchanges] in the compensation setting process and the ultimate effect they had on RN compensation." Defendants' Opposition Memo. at 10. They argue that "Willig's analysis of the payroll data makes him especially qualified to render an opinion regarding the effect the information exchanges had on compensation decisions. Id. Expert witnesses are not permitted to testify as to the "knowledge, motivations, intent, state of mind, or purposes" of others. See In re Fosamaz Products Liability Litigation, 645 F. Supp.2d 164, 192 (S.D.N.Y. 2009); In re Rezulin Products Liability Litigation, 309 F. Supp.2d 531, 546 (S.D.N.Y. 2004) ("[T]he opinions of these witnesses on the intent, motives, or states of mind of corporations, regulatory agencies and others have no basis in any relevant body of knowledge or expertise."); Taylor v. Evans, 1997 WL 154010, at * 2 (S.D.N.Y. 1997) ("[M]usings as to defendants' motivations would not be admissible if given by any witness - lay or expert."). Willig's expertise as an economist does not give him any specialized knowledge to discern the thought processes of those setting compensation at Defendant Hospitals. Id. ("regulatory expertise does not give her the ability to read minds.") Likewise, his expertise does not allow him to discern the effect the information learned in the information exchanges had on others' compensation-setting decisions.

Accordingly, Willig is permitted to testify to his economic analysis comparing the timing of the information exchanges with the timing of compensation decisions and his opinion that he finds no connection or correlation between the two. Conversely, Willig will not be permitted to

testify as to what information Defendants considered and the weight that information played in setting nurse compensation.

**IV.    CONCLUSION**

For the foregoing reasons Defendants' Joint Motion to Exclude Expert Testimony of Orley Ashenfelter [Docket No. 355/358] is DENIED; Defendants' Joint Motion to Exclude Expert Testimony of Gregory Vistnes [Docket No. 344/356] is DENIED; Defendants' Joint Motion for Summary Judgment [Docket No. 345] is DENIED; and Plaintiffs' Motion to Exclude Portions of Expert Testimony of Robert Willig is GRANTED IN PART.

**IT IS SO ORDERED**

Dated: July 22, 2010

Thomas J. McAvoy
Senior, U.S. District Judge